UNITED STATES of America,
Plaintiff–Appellee,

v.

John C. SHEFFEY, Defendant–Appellant.

No. 93–6534.

United States Court of Appeals,
Sixth Circuit.

Submitted May 5, 1995.

Decided June 29, 1995.

Steven H. Cook, Asst. U.S. Atty., Knoxville, TN (briefed), for plaintiff-appellee.

William H. Bell, Greeneville, TN, Kim A. Tollison, Federal Defender Services (briefed), Knoxville TN, for defendant-appellant.

Before: RYAN and BOGGS, Circuit Judges; ROSEN, District Judge.*

ROSEN, D.J., delivered the opinion of the court, in which RYAN, J., joined. BOGGS, J. (pp. 1433–35), delivered a separate opinion concurring in part and dissenting in part.

ROSEN, District Judge.

At approximately 3:20 p.m. on May 22, 1993, Defendant–Appellant John C. Sheffey ("Sheffey"), while driving his car on Little River Road in Great Smokey Mountains National Park, Tennessee, collided with a car driven by Martha Money. In the car with

---

* The Honorable Gerald E. Rosen, United States District Judge for the Eastern District of Michigan, sitting by designation.

Ms. Money were her parents, William and Mamie Shackelford. As a result of the accident, Mr. Shackelford died and Mrs. Shackelford and Ms. Money suffered serious injuries.

On June 2, 1993, a federal grand jury issued a three count indictment against Sheffey which charged him with one count of second degree murder and two counts of assault resulting in serious bodily injury. Sheffey stood trial on August 24–25, 1993, and was convicted on all three counts.

Sheffey now appeals his conviction for second degree murder on five different grounds. First, Sheffey contends that the district court erred in permitting four witnesses to answer the question "[w]hether, in your opinion, [Sheffey] was driving recklessly and in extreme disregard for human life?" Second, Sheffey argues that the instructions that the district court gave on how to distinguish murder from involuntary manslaughter were inadequate as a statement of the law. Third, Sheffey asserts that there was insufficient evidence supporting his conviction for second degree murder.[1] Fourth, Sheffey argues for the first time on appeal that Assistant United States Attorney Steven H. Cook, who prosecuted Sheffey, should have recused himself from the sentencing hearing because he had recently suffered a death in the family due to a drunk driver. Fifth and finally, Sheffey urges us to overturn his conviction because there were members of anti-drunk-driving organizations present at his trial who wore noticeable buttons and who may have had contact with jurors during the trial. Again, he raises this issue for the first time on appeal.

For the following reasons, we affirm the judgment of the district court.

## I.

The facts of this case are not in dispute. Sheffey is a forty-five year old man with a history of alcohol abuse. At the time of the accident, Sheffey claims he was experiencing devastating personal and financial problems. He and his wife were separated and in the process of getting a divorce. Sheffey was also being sued for child support for a six-teen year old child that he did not know that he had. Lastly, Sheffey's landlord had just evicted him from his apartment because his roommate was delinquent with his rent payments. Sheffey claimed that at the time of the accident he had nowhere to go. App. 122–27.

On May 14, 1993, Sheffey sought medical help from a physician, Dr. Maughon. Sheffey told Dr. Maughon of his excessive drinking and other personal problems. Dr. Maughon put Sheffey on a waiting list for a clinic, and he prescribed for him a sedative called Librium. App. 128–29.

Sheffey filled the prescription the next day, and he received forty ten milligram capsules. The prescribed dosage was six capsules per day. The pharmacist who filled Sheffey's prescription warned him that the drug causes drowsiness which, in turn, may be amplified by combining the drug with alcohol. The pharmacist instructed Sheffey that he should not drink alcohol while he was taking the drug, and this caution also appeared on warning labels attached to the drug's container. App. 111–12. Sheffey refilled the prescription on May 20, which suggests that he was taking more than the recommended dosage. Sheffey, however, testified that he refilled the prescription because he had lost the first bottle.

Sheffey admitted at trial that he had taken Librium and had been drinking heavily on May 22, 1993, the day of the accident. App. 136. He had left work at around 3 p.m. in his 1992 Toyota Corrola and proceeded to the nearby Great Smokey Mountains National Park. Sheffey stated that he was familiar with Little River Road; however, he did not recall any of the events of May 22 after the time he left work. App. 134. Sheffey added that he did not intend to hurt anyone on that day. *Id.*

The only other witness to testify who actually saw the collision, Ms. Money, had little to say about the matter. She stated that she was driving on her side of the road and approaching a curve at a speed of ten to fifteen miles per hour when suddenly Sheffey's car slammed into hers.

---

**1.** At trial, Sheffey conceded that he was guilty of at least involuntary manslaughter.

The bulk of the proofs consisted of eyewitness testimony from four people who were driving in front of, or behind, Sheffey shortly before the accident. Linda Vitale was a passenger in a minivan driven behind Sheffey. She testified that Little River Road is very narrow and curvy, and that one cannot see around the curves. She also stated that the road has a mountain to one side and a cliff on the other, so there is very little room to maneuver. Ms. Vitale added that despite these dangers Sheffey followed the car in front of him very closely and on several occasions darted across the double yellow line in an effort to pass. Sheffey later did cross the double yellow line to pass the car in front of him as well as a van in front of it. Ms. Vitale testified that Sheffey then proceeded to tailgate another van in front of him for several miles at about 25–30 miles per hour. It appeared to Ms. Vitale that Sheffey was following closely enough to bump the van. Moreover, she recalled that Sheffey was shaking his fist and pounding the door of his car in anger as he followed the van. This continued for several minutes, with Sheffey also darting across the double yellow line at times in an effort to pass. The van ahead of Sheffey finally pulled over to a limited shoulder area next to the road, and Sheffey passed it quickly by crossing the double yellow line. The accident happened shortly thereafter. App. 42–47.

At the very end of Ms. Vitale's direct testimony, the following exchange took place:

Q. [By Assistant United States Attorney Cook:] Based on your observations of the Defendant's conduct, would you tell us whether, in your opinion, he was driving recklessly and in extreme disregard for human life?

*Mr. Tollison* [defense counsel]: Your honor, I object to that. That's the ultimate decision of the jury.

*Mr. Cook:* Your honor, I think under Rule 70—

*Mr. Tollison:* I don't think she can make that decision.

*Mr. Cook:* I think under Rule 701—

*Mr. Tollison:* That's the question for the jury; your honor, please—

*Mr. Cook:* Sure it is. But the jury doesn't have the benefit of having been there, and I don't know why [it] couldn't consider her opinion under Rule 701.

*The Court:* Based on the fact that she's been driving for 24 years, I think she can say what her opinion is.

*By Mr. Cook* (continued):

Q. Would tell us whether, based on your observations of the Defendant's conduct and your experience in having driven for that number of years, whether, in your opinion, the Defendant was acting recklessly and in extreme disregard for human life?

A. In my opinion, for sure, definitely.

App. 49–50.

Dennis Gilliland, Ms. Vitale's husband and the driver of the minivan carrying both of them offered virtually identical testimony to his wife's. He also remembered that when Sheffey passed the second van immediately before the accident, blue smoke blew out of the exhaust of Sheffey's car. As Mr. Gilliland followed Sheffey past the van, he noticed Sheffey continue to accelerate into the curve in the road where the accident occurred. App. 53–63, 66.

Mr. Gilliland's testimony closed in much the same way as his wife's:

Q. Based on your observations of the Defendant's conduct, could you tell us whether, in your opinion, he was acting recklessly, in extreme disregard of human life?

*Mr. Tollison:* Your honor, again, I'm going to object to that question.

*The Court:* Overruled.

A. Yes.

App. 63.

Kirk Leonardi was the next witness. He was the driver of the van which Sheffey passed shortly before the accident. He stated that Sheffey was following him closely, and that he and his wife feared that Sheffey would ram their van. He also saw Sheffey shaking his fist at him, and he recalled that Sheffey tried to pass their van at least twice before he eventually did so by pulling into oncoming traffic. When Mr. Leonardi was finally able to pull over, he noticed that Shef-

fey passed him very quickly and then disappeared around a right curve in the road. By the time Mr. Leonardi got back on the road, the accident had occurred. App. 70–79.

Mr. Leonardi's direct testimony ended with the following colloquy:

Q. Based on your observations of Mr. Sheffey's driving, would you tell us whether, in your opinion, he was acting recklessly and in extreme disregard for human life in the fashion in which he was driving?

*Mr. Tollison:* Your honor, I object to that question again.

*The Court:* Overruled.

*By Mr. Cook* (continued):

Q. Do you want me to repeat it?

A. Yes, please.

Q. Based on your observations of the Defendant, Defendant's conduct, and the way he was driving, would you tell the ladies and gentlemen of the jury whether, in your opinion, he was acting recklessly and in extreme disregard for human life?

A. It was evident to me that he did not regard my safety like I regarded my safety. That's why I pulled off the road. I thought I was in danger. That's why I pulled off the road.

Q. Did you view his driving as placing others or as being in extreme disregard for human life?

A. To pass anyone on that road, you'd have to have complete disregard for human life.

App. 75–76.

The last eyewitness to the events leading up to the accident was Susan Leonardi, Mr. Leonardi's wife and the passenger in his van. She testified that they were driving at or near the posted speed limit that she recalled of 25 miles per hour. Sometime after Sheffey began tailgating them, her husband flashed his lights to signal Sheffey to back off. Sheffey did back off for a while, but then accelerated to tailgate their van once again. Mrs. Leonardi thought that Sheffey was going to strike their van when he accelerated back up to them, and she braced for an impact. Mrs. Leonardi also testified that while her husband was navigating a turn, Sheffey's car pulled about halfway to their side in the opposing traffic lane. Mrs. Leonardi stated then that her husband saw an oncoming car and sped up to allow Sheffey room to slip in behind their van. Mrs. Leonardi added that when her husband pulled over, Sheffey drove around them "like a bat out of hell." The Leonardis did not catch up to Sheffey until they reached the curve where the accident occurred, a turn that Mrs. Leonardi described as a "hairpin" one. App. 80–84.

The Government also asked Mrs. Leonardi for her opinion on Sheffey's driving:

Q. Based on your observations of the Defendant's actions and conduct, would you tell us whether in your opinion he was acting recklessly and in extreme disregard for human life?

*Mr. Tollison:* Your honor, I'll make the same objection.

*The Court:* Overruled.

*By Mr. Cook* (continued):

Q. You may answer.

A. I can answer? Yes, in my entire driving career, and even as my career as a passenger in a car prior to that, I have never seen driving like that.

App. 84.

Julie Parish, a United States Parks Ranger who arrived on the scene after the accident, described the curve where the accident occurred as a 90 degree turn. She stated that the curve is marked as such, but no speed limit is posted. Ms. Parish also testified that a safe speed to drive while making this turn is 10 miles per hour. The posted speed limit for Little River Road is 30 miles per hour for straightaways and 20 miles per hour for curves. Lastly, Ms. Parish added that about two miles up the Little River Road was a safe area to pass vehicles. App. 98–99.

Another United States Ranger who investigated the accident found in Sheffey's car two empty vodka pint bottles, at least one Sprite can, five unopened beer cans, one partially empty beer can, and a bottle of Librium with only twenty-four capsules remaining. The absence of sixteen capsules from the May 20, 1993 prescription only two

days later suggested that Sheffey may have consumed more than the prescribed dosage of six capsules a day. The same ranger who checked the contents of Sheffey's van interviewed him a few days after the accident. During that interview, Sheffey admitted to drinking vodka mixed with Sprite on the day of the accident, and further stated that he thought he was driving 40 to 45 miles per hour. App. 106, 110.[2]

The Government's proofs closed with the results of a drug test performed on Sheffey at 5:50 p.m. (approximately two and a half hours after the accident). The test revealed a blood alcohol level of .22 grams per 100 milliliters of blood and 4.2 micrograms of Librium per milliliter of blood. App. 121.[3]

At the end of all the proofs, the district court instructed the jury. The most important instruction it gave for the purposes of this appeal was on the issue of whether Sheffey had committed second degree murder or involuntary manslaughter. The district court stated:

> Ladies and gentlemen, the difference between malice, which will support a conviction for murder, and gross negligence, which will permit a conviction for involuntary manslaughter is one of degree.
>
> Second degree murder requires proof beyond a reasonable doubt of malice aforethought. Recklessness may constitute malice aforethought where the defendant acts with extreme disregard for human life.
>
> Thus, where the defendant acts with reckless disregard for human life which is not of an extreme nature, a defendant may only be convicted of involuntary manslaughter.

App. 147. The jury rejected Sheffey's plea to be found guilty of only involuntary manslaughter, and it returned a guilty verdict for second degree murder.

The final factual elements that form the basis of Sheffey's appeal are these: (1) Sheffey submitted affidavits from his sister and

two other individuals who attended his sentencing alleging that Mr. Cook broke down in tears at Sheffey's sentencing hearing when he recounted the death or injury of various family members at the hands of a drunk driver. (2) Sheffey also submitted affidavits from his sister, his ex-wife, and a private investigator who spoke with court staff who attended the Sheffey trial alleging third-party misconduct before the jury. More specifically, the affidavits state that members of two anti-drunk-driving groups (Remove Intoxicated Drivers ("RID") and the East Tennessee Victims' Rights Task Force ("ETVRTF")) were present at his trial, wore various easily identifiable insignia in support of their cause in the courtroom, and went so far as to eat lunch with the jurors on the case. With respect to this last basis for appeal, Sheffey admits that at no time did he bring these matters to the attention of the district court.

## II.

■ Sheffey's first ground of appeal is that the trial court erred by permitting Ms. Vitale, Mr. Gilliland and Mr. and Mrs. Leonardi to answer the question whether they believed Sheffey was driving recklessly and in extreme disregard for human life. Sheffey argues that this question calls for a legal conclusion and, alternatively, that such opinion testimony was impermissible because it was not helpful to the jury. The Government counters that Sheffey did not preserve these issues for appeal because his counsel objected only on the grounds that the question called for an opinion on the ultimate issue of fact. The Government also argues that this opinion testimony was properly admitted even assuming Sheffey preserved his objection to it.

These issues require an analysis of two of the Federal Rules of Evidence, Rule 704 and Rule 701. Rule 704 states: "[T]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it em-

---

**2.** Sheffey told the ranger that he thought he had been driving on U.S. 321, another road nearby. App. 110.

**3.** Both federal and state law create a presumption of intoxication when one's blood alcohol level is .10 grams per 100 milliliters. *See* 36 C.F.R. § 4.23; Tenn.Code Ann. § 55–10–408(b).

braces an ultimate issue to be decided by the trier of fact." Rule 701, for its part, states:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

Even a cursory review of these rules and the trial record demonstrates that Sheffey preserved his right to appeal the admissibility of the lay witness opinions in this case. Fed.R.Evid. 103(a)(1) (emphasis added) requires a party opposing the admission of evidence to make a timely objection "stating the specific ground of objection, *if the specific ground was not apparent from the context.*" In this case, both Rule 704 and 701 were presented to the district court before it ruled on the admissibility of the lay witness opinions. Moreover, Rule 704, the basis upon which Sheffey plainly relied at trial to hold that the testimony was inadmissible, clearly incorporates the analysis of Rule 701 by inclusion of the language "otherwise admissible." In other words, Sheffey's argument before the district court that the testimony was inadmissible because it embraced the ultimate issue of Sheffey's guilt for second degree murder could not be rejected unless the district court considered the admissibility of the lay witness opinion evidence under Rule 701. Because Rules 704 and 701 were presented to the district court—both explicitly by the arguments of counsel and implicitly by the integrated nature of an inquiry into whether lay witness testimony on an ultimate issue for the jury is admissible— we hold that Sheffey may proceed with his arguments against the testimony. *See Torres v. County of Oakland,* 758 F.2d 147, 149 & n. 1 (6th Cir.1985) (holding that objection to lay witness opinion which did not specify the grounds for the objection nonetheless preserved the possible error for appeal; the district court's ruling that the lay witness "may state her opinion on that" sufficiently presented the context of the objection).

Sheffey first challenges the admission of the testimony on the grounds that it called for a legal conclusion and was, therefore, unhelpful to the jury.[4] Of course, not all testimony that expresses an opinion on an ultimate issue is *ipso facto* unhelpful to the jury. Rule 704 removes the general "proscription against opinions on 'ultimate issues' and shift[s] the focus to whether the testimony is 'otherwise admissible.'" *Torres v. County of Oakland, supra,* at 150.

In *Torres,* the plaintiff brought a Title VII suit alleging national origin discrimination after she failed to receive a promotion. During trial, defense counsel asked Dr. Quiroga, one of the individuals involved in the interview process, whether she believed "that Ms. Torres had been discriminated against because of her national origin in that interview process." Over objection, Dr. Quiroga was permitted to answer, and stated that she did not believe there was any discrimination. 758 F.2d at 149.

On appeal, plaintiff argued that because Dr. Quiroga's testimony was couched as a legal conclusion, it was not helpful to the jury under Rule 701. The *Torres* panel agreed, stating:

> The problem with testimony containing a legal conclusion is in conveying the witness' unexpressed, and perhaps erroneous, legal standards to the jury. This "invade[s] the province of the court to determine the applicable law and to instruct the jury as to that law." Although trial judges are accorded a relatively wide degree of discretion in admitting or excluding testimony which arguably contains a legal conclusion, that discretion is not unlimited. This discretion is appropriate because it is often difficult to determine whether a legal conclusion is implicated in the testimony.

758 F.2d at 150 (citations omitted).

*Torres* then announced the test that should be applied in determining whether a question posed to a lay witness calls for an impermissible legal conclusion:

---

4. Sheffey does not contend that the answers given by the lay witnesses in this case failed the first prong of the Rule 701 test, namely, that they be rationally based upon the witnesses' own perceptions.

*The best resolution of this type of problem is to determine whether the terms used by the witness have a separate, distinct and specialized meaning in the law different from that present in the vernacular.* If they do, exclusion is appropriate. Thus, when a witness was asked whether certain conduct was "unlawful," the trial court properly excluded the testimony since "terms that demand an understanding of the nature and scope of the criminal law" may be properly excluded.

758 F.2d at 151 (citations omitted) (emphasis added). Application of this standard to the facts of *Torres* led the panel to conclude that error had indeed occurred:

The precise language of the question put to Dr. Quiroga was whether "Torres had been discriminated against because of her national origin." In concluding that this question called for an improper legal conclusion, we rely upon several factors. First, the question tracks almost verbatim the language of the applicable statute. Title VII makes it unlawful for an employer to "discriminate against any individual ... because of such individual's ... national origin." Second, the term "discrimination" has a specialized meaning in the law, and in lay use the term has a distinctly less precise meaning.

We emphasize that a more carefully phrased question could have elicited similar information and avoided the problem of testimony containing a legal conclusion. The defendants could have asked Dr. Quiroga whether she believed Torres' national origin "motivated" the hiring decision. This type of question would directly address the factual issue of Dr. Malueg's[5] intent without implicating any legal terminology.

758 F.2d at 151 (citations omitted). Nevertheless, the *Torres* panel found the error to be harmless. *Id.*

We see no reason to revisit the central holding of *Torres:* if an opinion question posed to a lay witness does not involve terms with a separate, distinct and specialized meaning in the law different from that present in the vernacular, then the witness may answer it over the objection that it calls for a legal conclusion. Applying that standard to the facts of this case, we do not see any specialized legal terms in the question "Did Mr. Sheffey, at the time of the accident, drive recklessly and in extreme disregard of human life?" Simply because this question embraced the terms of the jury instruction on malice aforethought does not dictate a ruling that it called for a legal conclusion as defined by *Torres.* Indeed, jury instructions are carefully drafted and crafted to rely upon terms commonly used and understood in the vernacular. They permit jurors to draw from their own everyday experience in making legal conclusions, such as the one in this case that Sheffey was guilty of second degree murder. We see nothing in the terms "recklessly" and "extreme disregard of human life" that would require the jury to attempt to define for itself legal terms of art or to rely upon anything but their own life experience in determining Sheffey's guilt.[6] Therefore, we hold that the district court did not err by admitting the answers despite Sheffey's protests that they called for a legal conclusion.

We draw further support for its holding from another of our cases, *Heflin v. Stewart County, Tennessee,* 958 F.2d 709 (6th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 598, 121 L.Ed.2d 535 (1992). In that case, plaintiffs were family members of a pre-trial detainee who hung himself to death in a county jail. Plaintiffs alleged, *inter alia,* that defendant officers violated 42 U.S.C. § 1983 by acting with deliberate indifference to the deceased's serious medical needs once the officers found

---

**5.** The proofs in *Torres* demonstrated that Dr. Malueg was the final decisionmaker with respect to plaintiff's promotion application. 758 F.2d at 149.

**6.** The witnesses responses to the question clearly demonstrate that they had no trouble understanding the meaning or import of it, and that they did not need to ask for further explanation,

context or elucidation when given the question. For example, when the question was put to Ms. Vitale, she responded, "In my opinion, for sure, definitely." Mr. Gilliland responded directly, "Yes." Both Mr. and Mrs. Leonardi's responses were more detailed, but they still clearly reflected that they understood the question.

his body. The proofs showed that defendant officers did nothing to cut down the deceased's body or to resuscitate him until well after the body was discovered. The district court ordered that judgment be entered on the jury verdict in favor of plaintiffs. 958 F.2d at 711–12.

Among the evidence presented at trial was the testimony of Edward Totten, an expert in the field of correctional institutions.

> Totten stated, "The training provided by the Tennessee Corrections Institute and every other jailer training program that I am familiar with requires a jailer, when he discovers an inmate hanging, to find something or someone to support the person's weight, to call for assistance, and assure the immediate application of first aid and/or CPR by trained persons."
>
> The statement added that the jailer should cut the victim down immediately with one person holding the body up and the other cutting the noose. Officers should never stand by and let the hanging victim continue to hang in order to protect the "scene of the crime." Further, even though there are no vital signs, officers should not presume that death has already occurred. " 'Dead' people are alive today due to CPR." On the contrary, officers should presume that the hanging inmate is alive and administer first aid until told by a physician to stop. Totten emphasized that Heflin's body was still warm and that his feet were touching the floor. "For the Sheriff, Deputy Crutcher and Jailer Luffman to allow him to continue to hang unsupported and withhold the life saving measures mandated by TCI Training under these circumstances is contrary to their training and common sense."

958 F.2d at 714–15. Totten concluded by stating, "In my opinion, they [defendant officers] were deliberately indifferent to Mr. Heflin's needs for emergency care which could have saved his life."

On appeal, defendant officers urged reversal of the district court's denial of a directed verdict on the ground that Totten's testimony contained an impermissible legal conclusion. *Heflin* rejected that argument with the following reasoning:

> The real problem with this statement, according to the defendants, is that it did not assist the jury in determining whether the defendants were deliberately indifferent to Heflin's medical needs. Rather, it constituted an opinion on a key legal issue in the case, and was inadmissible under Rule 702 of the Federal Rules of Evidence. . . .[7]
>
> The plaintiffs respond that, in context, Totten's opinion was based on the facts and on his conclusion that the defendants had completely disregarded the prescribed practices for dealing with an inmate found hanging. He used "deliberately indifferent" in the way an ordinary laymen would to describe such conduct—to state his opinion on the ultimate fact, not to state a legal conclusion. The district court's instructions, in addition to advising that an expert's opinion should be received with caution, charged the jury that in order for the defendants to be liable, their conduct must be "deliberately indifferent tantamount to an intent to punish" or "conduct which shocks the conscience." Totten did not express an opinion on whether the defendant's conduct was tantamount to an intent to punish or shocked the conscience.
>
> . . . .
>
> We do not believe the district court committed reversible error in permitting the jury to hear this particular evidence. Totten did not claim to be an expert on the legal requirements for recovery from jail officials for dereliction of duty. He testified concerning the proper procedures to be followed in the situation faced by the defendants. After setting forth *in detail* the manner in which the defendants failed to follow approved procedures, he stated that in his opinion this conduct demonstrated deliberate indifference to Heflin's need for "emergency care which could have saved his life." *The testimony mere-*

---

7. Rule 702 states: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

*ly emphasized the witness's view of the seriousness of the defendant's failures.* Given the generality of the test, "will assist the trier of fact," we find no abuse of discretion in admitting this testimony.

958 F.2d at 715 (emphasis added).

*Heflin,* then, also supports a finding that the district court in this case did not err by permitting the eyewitnesses to Sheffey's pre-accident conduct to answer the question whether they believed he was driving recklessly and in extreme disregard for human life. Just as in *Heflin,* the eyewitnesses' testimony here merely emphasized their well-developed recollections of Sheffey's erratic behavior on May 22, 1993. Thus, even though this testimony incorporated the instructions about to be given to the jury on whether Sheffey had the *mens rea* necessary for a conviction of second degree murder, it did not state a legal conclusion. Rather, the testimony set out observation-based opinions by lay people—expressed in terms easy for non-lawyers to understand—on the ultimate issue of fact.

■ Sheffey also contends that even if we find that the answers given to the Government's questions on Sheffey's driving did not call for a legal conclusion, they nonetheless were unhelpful to the jury. According to Sheffey, the jury was in just as good a position as the eyewitnesses to determine if Sheffey was driving recklessly and in extreme disregard for human life. Therefore, the eyewitnesses' opinions added nothing to their ability to make a decision. We also find this argument unpersuasive.

In *McGowan v. Cooper Indus., Inc.,* 863 F.2d 1266 (6th Cir.1988), this circuit established its test for whether lay and expert witness testimony is helpful to the jury and, thus, admissible. *McGowan* involved an accident in which plaintiffs were severely injured after the explosion of a compressor being reconstructed by Harold Babcock. Plaintiffs proffered the testimony of an expert who would have testified on the adequacy of Babcock's performance on the compressor rebuilding project. In particular, the expert "would have testified that Babcock (1) was 'the most knowledgeable' person present with respect to compressor operations; ...

and (3) was negligent in failing to confirm that the discharge valve was open ..." 863 F.2d at 1272.

The district court excluded Green's [the expert's] proffered testimony, concluding that it was not based on Green's status as an expert. The court reasoned that the testimony was not based on "scientific, technical, or other specialized knowledge," but rather on Green's lay opinion of the *facts* of the case and that as such, his opinion would not "assist the jury on a fact that they can decide as well as an expert."

...

... Initially, the jury had to determine the appropriate scope of Babcock's duty. In this regard, Green's [the expert's] testimony on industry custom was helpful and should have been admitted under Rule 702 as specialized knowledge outside of a lay juror's experience. But once the jury heard all of the evidence on the scope of Babcock's duty, it was as qualified as Green to determine whether Babcock breached that duty. Green's proffered testimony as to the adequacy of Babcock's performance consisted of opinions which were not helpful to the jury because they addressed matters that were equally within the competence of the jurors to understand and decide, and thus were inadmissible under Fed.R.Evid. 701 and 702.

863 F.2d at 1272–73.

We do not believe that *McGowan* dictates a finding that the eyewitnesses' answers to whether they believed Sheffey was driving recklessly and in extreme disregard of human life were unhelpful. The key distinction between the facts of this case and those in *McGowan* is that here the lay opinion testimony came from actual eyewitnesses who clearly observed Sheffey's behavior immediately before the accident, instead of from an expert hired after the fact to support a party's case. Put another way, in this case the jury was *not* in as good a position to evaluate Sheffey's state of mind as were the lay witnesses because the jury did not have the same kind of contemporaneous and up-close view of Sheffey's driving. In such a situation, we cannot hold that the eyewitnesses' testimony in this case was unhelpful. *See*

*Government of Virgin Islands v. Knight,* 989 F.2d 619, 630 (3d Cir.) (holding that eyewitness should have been allowed to testify that, in his opinion, defendant's firing of a gun was accidental; this was because "the witness' opinion that the gunshot was accidental would have permitted him to relate the facts with greater clarity, and hence would have aided the jury"); *cert. denied,* — U.S. —, 114 S.Ct. 556, 126 L.Ed.2d 457 (1993).

■ For these reasons, then, we hold that the district court properly admitted the answers given by Ms. Vitale, Mr. Gilliland, and Mr. and Mrs. Leonardi on whether they believed that Sheffey was driving recklessly and in extreme disregard for human life.[8] We will now turn to Sheffey's other arguments on appeal.

### III.

■ Sheffey additionally claims that the district court erred in failing to adequately instruct the jury on the difference between the *mens rea* necessary to sustain convictions for second degree murder and involuntary manslaughter. As noted earlier, the district court gave the following instruction on the distinction:

> Second degree murder requires proof beyond a reasonable doubt of malice aforethought. Recklessness may constitute malice aforethought where the defendant acts with extreme disregard for human life.
>
> Thus, where the defendant acts with reckless disregard for human life which is not of an extreme nature, a defendant may only be convicted of involuntary manslaughter.

Sheffey contends that this instruction does not give the jury as complete an understanding of what constitutes malice aforethought as Sheffey's proposed instruction. *See* Sheffey's Brief, pp. 20–25.[9] The Government counters by asserting that the instruction given was an accurate statement of law and, thus, was not error.

This circuit has set a high standard for reversal of a conviction on the grounds of improper instructions. In *United States v.*

---

8. Even if this Court were to find error in admitting the answers, the Court believes that such error would be harmless. *See* Fed.R.Crim.P. 52(a). As will be noted below, the jury in this case had more than adequate evidence from which to conclude beyond a reasonable doubt that Sheffey was guilty of second degree murder—even without the lay opinion testimony discussed above. In light of this fact, the Court cannot say that any of Sheffey's substantial rights were affected by the admission of this evidence.

9. Sheffey's proposed instruction on malice aforethought (unedited) read as follows:
 "Malice in connection with the crime of killing is but another name for a certain condition of a man's heart or mind, and as no one can look into the heart or mind of another, the only way to decide upon its condition at the time of the killing is to infer it from the facts," and that is for you, the jury, to decide. "The presence or absence of this malice or mental condition marks the boundary which separates the two crimes of murder and manslaughter." *Stevenson v. U.S.,* 162 U.S. 313, 16 S.Ct. 839, 40 L.Ed. 980 (1896). "The difference between that recklessness which displays depravity and such extreme and wanton disregard for human life as to constitute 'malice' and that recklessness that amounts only to manslaughter lies in the quality of awareness of the risk." *U.S. v. Dixon,* 419 F.2d 288, 292–93 (D.C.Cir.1969). "[D]isregard for human life becomes more cal-

lous, wanton or reckless, and more probative of malice aforethought, as it approaches a mental state comparable to deliberation and intent." *U.S. v. Lesina,* 833 F.2d 156 (9th Cir.1987). "Malice aforethought ... embraces the state of mind with which one intentionally commits a wrongful act...." *Cf. U.S. v. Celestine,* 510 F.2d 457, 459 (9th Cir.1975). Malice aforethought may be inferred from circumstances which show a wanton and depraved spirit, a mind bent on evil mischief without regard to its consequences. *See U.S. v. Roston,* 986 F.2d 1287 (9th Cir.1993); U.S. v. *Celestine,* 510 F.2d 457, 459 (9th Cir.1975).
 It is for you, the jury, to decide whether the facts in this case warrant an inference of malice aforethought. If you find that the defendant acted with "extreme indifference to the value of human life," Model Penal Code § 210.2 (1985), you may convict the defendant of second degree murder.
 If, however, you find that the defendant's mental state shows a wanton or reckless disregard for human life but not of the extreme nature that will support a finding of malice aforethought, then you may only convict the defendant of manslaughter. *See U.S. v. Fleming,* 739 F.2d 945 (4th Cir.1984), *cert. denied,* 469 U.S. 1193, 105 S.Ct. 970, 83 L.Ed.2d 973 (1985); *U.S. v. Pardee,* 368 F.2d 368, 375 (4th Cir.1966).
 App. 25–26.

*Clark,* 988 F.2d 1459, 1468 (6th Cir.) (citations omitted), *cert. denied,* —— U.S. ——, 114 S.Ct. 105, 126 L.Ed.2d 71 (1993), we stated:

> An appellate court must review jury instructions as a whole in order to determine whether they adequately inform the jury of the relevant considerations and provide a sound basis in law to aid the jury in reaching its decision. A reviewing court may reverse a judgment only if the instructions, viewed as a whole, were confusing, misleading and prejudicial.

*See also United States v. Busacca,* 863 F.2d 433, 435 (6th Cir.1988) ("The trial court is 'vested with broad discretion in formulating its charge and will not be reversed unless its charge fails accurately to reflect the law.'") (citation to quoted cases omitted), *cert. denied,* 490 U.S. 1005, 109 S.Ct. 1640, 104 L.Ed.2d 156 (1989).

We believe that the district court's instruction to the jury on the difference between the state of mind necessary to convict for second degree murder and involuntary manslaughter was not in error. The instruction properly informed the jury that if Sheffey demonstrated *extreme* disregard for human life, he could be found guilty of second degree murder; otherwise, he was guilty only of involuntary manslaughter.[10] This is an accurate statement of the law.

In a decision handed down only a few months ago, *United States v. Milton,* 27 F.3d 203 (6th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 741, 130 L.Ed.2d 642 (1995), this Court for the first time defined malice aforethought by adopting the definition developed by other courts of appeal.

> The Eighth Circuit stated that "[m]alice may be established by evidence of conduct which is 'reckless and wanton, and a gross deviation from a reasonable standard of care, of such nature that a jury is warranted in inferring that defendant was aware of a serious risk of death or serious bodily harm.'" *See United States v. Black Elk,* 579 F.2d 49, 51 (8th Cir.1978) (citing *Unit-*

*ed States v. Cox,* 509 F.2d 390, 392 (D.C.Cir.1974)). The Ninth Circuit defined malice aforethought as including "the state of mind with which one intentionally commits a wrongful act without legal justification or excuse." *United States v. Celestine,* 510 F.2d 457, 459 (9th Cir.1975). The *Celestine* panel further noted that malice aforethought "may be inferred from circumstances which show 'a wanton and deprived spirit, a mind bent on evil mischief without regard to its consequences.'" *Id.*

27 F.3d at 206–07. Applying this composite definition to the facts of the case before it, this Court stated:

> Milton, unprovoked, fired at least two shots into the victim's car. Despite Milton's statement that he only meant to scare Beasley, from his actions we infer that he must have been aware of a risk of death or serious bodily injury. Milton's gross deviation from a reasonable standard of care established the requisite malice aforethought to hold him accountable for second degree murder.

27 F.3d at 208.

 We believe that the jury instructions in this case adequately identified the level of *mens rea* necessary for a second degree murder conviction by stressing to the jury that Sheffey's admitted recklessness must have demonstrated an *extreme* disregard for human life to support such a conviction. This instruction mirrors the standard for malice aforethought set out in *Milton:* When a defendant grossly deviates from the standard of care to such an extent that a jury could conclude that he must have been aware of a serious risk of death or serious bodily injury then malice aforethought can be attributed to him. Because the instruction was an accurate statement of the law and was in no way confusing, misleading or prejudicial to Sheffey, we will not overturn his conviction on the grounds that the jury was improperly instructed.[11]

---

10. It is worth repeating at this point that Sheffey conceded that he was guilty of at least involuntary manslaughter.

11. Sheffey also asserts that the instruction given to the jury was not as thorough as the one that he proposed in the middle of trial. The Government correctly points out, however, that

## IV.

Sheffey's next argument on appeal is that there was insufficient evidence to support his conviction for second degree murder. The Government counters by stating that the proofs demonstrate a textbook example of reckless driving in extreme disregard of human life.

This circuit has stated on numerous occasions that a defendant claiming insufficiency of the evidence bears a heavy burden. *See, e.g., United States v. Wright,* 16 F.3d 1429, 1439 (6th Cir.), *cert. denied,* — U.S. —, 114 S.Ct. 2759, 129 L.Ed.2d 874 (1994). We must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *United States v. Evans,* 883 F.2d 496, 501 (6th Cir.1989)).

■ The elements for second degree murder in violation of 18 U.S.C. § 1111 are: (1) the unlawful killing of a human being; (2) with malice aforethought; and (3) within the special maritime or territorial jurisdiction of the United States. It is beyond dispute that Sheffey killed Mr. Shackelford without justification in a United States National Park. We also find more than sufficient evidence in the trial record that this killing was done with the recklessness and extreme disregard for human life necessary for a finding of malice aforethought. Sheffey was legally intoxicated at the time of the accident, and was also under the influence of a prescription drug whose side effect of drowsiness may have been enhanced by his alcohol consumption. Witness after witness vividly testified as to the consistently dangerous driving by Sheffey leading up to the accident. They also described in detail the precarious nature of Little River Road, a road that Sheffey admitted to knowing well. In light of this uncontradicted evidence, we cannot say that no

reasonable jury could conclude that Sheffey was guilty of second degree murder. Sheffey's testimony that he did not intend to hurt anybody on May 22, 1993, is unavailing. Unfortunately for Sheffey, actions speak louder than words, and the evidence of his conduct that day fully supported the jury's verdict.

## V.

■ Sheffey's next assignment of error states that he was prejudiced by Assistant United States Attorney Cook's alleged emotional outburst at his sentencing hearing. He claims that Mr. Cook should have recused himself from the sentencing hearing because of his personal involvement in the case. As previously noted, this argument was. raised for the first time on appeal; the district court was never given an opportunity to consider it. Unless exceptional circumstances are present, this court normally will not address issues not raised for the first time in the district court. *Foster v. Barilow,* 6 F.3d 405, 407 (6th Cir.1993).

■ Exceptional circumstances are notably lacking here. Sheffey does not claim that the sentence that he received was inconsistent with the Sentencing Guidelines, or that the district court was swayed by Mr. Cook's recounting of the personal losses he has suffered due to drunk drivers. There is, then, no evidence of record that even if we ordered Mr. Cook removed from this case the result would be any different.

## VI.

Sheffey's final argument, also raised for the first time on appeal, presents more troubling issues. With supporting affidavits provided to us from his sister and his ex-wife, who were present at his trial, and a private investigator, who looked into the matter after trial, Sheffey asserts that the jury was im-

---

The court is not required to give requested instructions in the exact language requested, even if they correctly state the law. Indeed, it is usually preferable for the court to use its own language in framing instructions. It is enough that the charge adequately and correctly covers the substance of the requested instructions.

2 Charles A. Wright, *Federal Practice & Procedure* § 482, at 688–89 (2d ed.1982) (footnotes collecting authorities omitted). Because the district court delivered an instruction which adequately set forth the governing law on malice aforethought, it did not err by refusing Sheffey's proposed instruction on that issue.

properly prejudiced against him by the presence in the courtroom during the trial of some four to five members of anti-drunk-driving groups, all of whom were wearing noticeable buttons reflecting their cause. Even more disconcerting is Sheffey's contention, also supported by the affidavits from his sister and ex-wife, that these activists "even went so far as to eat lunch with the jurors" during his trial.

■ At least one circuit has held, after reviewing an extensive evidentiary record, that the presence in the courtroom of activists with easily observable signs or insignia hostile to the crimes a defendant is charged with committing is grounds for the reversal of a conviction because it undermines the presumption of innocence and the right of the defendant to confront his accusers. *See Norris v. Risley,* 918 F.2d 828, 831–34 (9th Cir.1990) (reversing denial of petition for habeas corpus by Montana state prisoner). Moreover, it cannot be disputed that unauthorized conversations by third persons with jurors regarding the case that they are deciding may provide grounds for a new trial if it can be established that those conversations, in fact, occurred. *See* 3 Charles A. Wright, *Federal Practice & Procedure* § 554, at 249–50 (2d ed. 1982 & 1994 Supp.).

In this case, however, Sheffey admits that, unlike the defendant in *Norris,* he did not bring to the district court's attention his current objections to the presence of the activists in the courtroom and their possible improper luncheon contact with the jurors either during the trial or in a Fed.R.Crim.P. 33 motion for a new trial. This is despite the fact that two of the three affidavits on which Sheffey relies to support his claim of misconduct involving the jury—and the only two which allege that the activists lunched with the jurors—are from his sister and ex-wife, who observed the complained-of activities during the trial. Sheffey, therefore, had available to him at the time of the trial all of the evidence upon which he bases his argument of improper jury influence. Indeed, even though Sheffey did not raise the improper influence argument until a supplemental brief to this appeal, he does not con-

tend that the evidence on which he relies was newly discovered.

■ We have held that when a criminal defendant raises issues of misconduct affecting the jury for the first time on appeal, he must show actual prejudice to prevail. *See United States v. Griffith,* 17 F.3d 865, 880 (6th Cir.1994) ("[W]here failure to hold a hearing on jury misconduct is raised for the first time on appeal, the defendant 'must demonstrate from facts in the record that actual prejudice occurred.'") (citation omitted), *cert. denied,* —— U.S. ——, 115 S.Ct. 149, 130 L.Ed.2d 89 (1994). *Cf. United States v. Sorenson,* 611 F.2d 701, 702 (8th Cir.1979) ("[O]bjections based on jury misconduct during the trial cannot be raised for the first time on appeal when counsel did not apprise the trial court of the alleged misconduct at trial."); Wright, *supra,* at 260 ("Objections based on misconduct concerning the jury cannot be raised for the first time on appeal."). This is a sensible rule. A trial court should normally be given the opportunity to cure any possible prejudice to a defendant during the trial or as close to it as possible. Indeed, Fed.R.Evid. 606 (emphasis added) appears to contemplate a deliberative process in the trial court when allegations of outside influence are raised by providing "... a juror may *testify* on the question whether any outside influence was brought to bear upon any juror." Pretty clearly, this Rule anticipates that a trial court should be given the opportunity to take testimony concerning the allegations of outside influence. Nonetheless, the "actual prejudice" rule in this circuit still permits a criminal defendant to argue improper influence on appeal, but only if he can, in fact, show actual prejudice. As a practical matter, however, we must note that this burden will be extremely difficult to meet if there is nothing of record in the trial court proceedings to which a defendant can point.

■ Here, Sheffey fails to meet his burden of showing actual prejudice. *See United States v. Pennell,* 737 F.2d 521, 529–34 (6th Cir.1984) (upholding district court's ruling that defendants did not show actual prejudice caused by anonymous third-party telephone contacts to five jurors after reviewing district

court's questioning of the entire jury on the impact of the calls on their impartiality), *cert. denied,* 469 U.S. 1158, 105 S.Ct. 906, 83 L.Ed.2d 921 (1985). With respect to the allegation that the activists had lunch with members of the jury, there is no evidence, even in the affidavits, that conversations about Sheffey's trial or related matters took place, or that the jurors actually even talked directly to the activists, as opposed to simply being in the same restaurant or vicinity of the jurors.[12] We have no basis, therefore, on which to conclude that the jury's impartiality was tampered with by the activists at these lunches. Similarly, while we accept as true the allegations that members of RID and ETVRTF were present at the trial and did wear anti-drunk-driving buttons, we cannot say, without a more developed record as present in *Norris,* that this constituted a violation of Sheffey's right to a fair trial or his right to confront adverse witnesses.[13] We simply do not know whether the jurors noticed the presence of these activists or the nature of their cause, and, even if they did, whether such matters undermined their impartiality. Because Sheffey has not shown actual prejudice, and because we are unwilling to presume such prejudice on the basis of the affidavits submitted, we reject his final assignment of error.

## VII.

For the foregoing reasons, then, we AFFIRM the judgment of conviction entered by Hon. Leon Jordan, U.S. District Judge for the Eastern District of Tennessee.

BOGGS, Circuit Judge, concurring in part and dissenting in part.

I concur in all of the court's opinion in this case, except for its holding in Section II of the opinion that the district court properly

admitted the statements by four key witnesses that Sheffey was driving "recklessly and in extreme disregard for human life." I will concede at the outset that the legal question here turns on niceties that may seem contrary to common sense. The jury is being asked to decide a question of degree: just how bad was Sheffey's driving, and was it bad enough to impute actual malice as his motive (when there was absolutely no evidence of such motive in actuality). The witnesses were clearly in the best position to explain just how bad his driving was, and even to put it in a framework of experience. This was done most succinctly and emphatically by Mrs. Leonardi, when she stated: "in my entire driving career, and even as [sic] my career as a passenger in a car prior to that, I have never seen driving like that."

The content of that statement is not objected to, and it was surely extremely powerful. At the same time, a finding of second-degree murder requires action well beyond "gross negligence"; it requires such recklessness that one can infer that Sheffey acted "willfully, deliberately, and with malice aforethought," to quote the indictment. Because these terms are words of legal import, even if in reality they may convey nothing more than driving that is "awful"—"really awful"— or "absolutely terrible," the jury is required to grapple with them as words of legal import.

Rule 704 opens the door to conclusory opinions by declaring that testimony "is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." On the other hand, Rule 701 and the cases decided under it partially close this door by limiting lay testimony to those opinions that are "helpful" to [1] "a clear understanding of the witness' testimony," or [2] "the determination of a fact in issue."

12. It is significant to note that the affidavits of Sheffey's ex-wife and sister are conclusory in nature as to their allegation that the activists ate lunch with the jurors. No detail is provided and the substantive wording of the two affidavits is identical, indicating that they were drafted by the same person. In contrast to this, the affidavit from the private investigator includes a detailed report which includes interviews with the activists who were allegedly at the trial. Importantly,

neither the investigator's affidavit nor her report even mention the alleged luncheon contact.

13. We do not mean to reject the rule announced by *Norris* out of hand; rather, we believe a more fully developed factual record must be presented before we can directly decide the question whether the presence of activists bearing insignia indirectly hostile to a criminal defendant violates that defendant's constitutional trial rights.

Our circuit's case of *Torres v. County of Oakland,* which the court discusses at some length, seems to me to be virtually on all fours with our case. A witness was asked for an opinion: "Had Ms. Torres been discriminated against because of her national origin?" This question was certainly in one sense helpful to understand the testimony, as a succinct summary of it, and helpful to a factual determination—the ultimate issue. Even so, our court found that the testimony was not helpful to the jury because Rule 701 was designed to protect "against the admission of opinions which would merely tell the jury what result to reach, somewhat in the manner of the oath-helpers of an earlier day." *Torres,* 758 F.2d at 150 (quoting Advisory Committee note to Rule 704).

The law in this circuit, based on *Torres,* is that Rule 701 does establish a standard somewhat more stringent than a simple reading of the words "clear understanding of the witness' testimony" or "determination of a fact in issue," would imply. The reason for this stringency is, as the *Torres* panel stated, that such "testimony conveying a legal conclusion [conveys] the witness' unexpressed, and perhaps erroneous, legal standards to the jury." *Ibid.*

The court in *Torres* noted that the question tracked almost verbatim the language of the applicable statute. So does the question here. The court in *Torres* held that the word "discrimination" had a "specialized meaning in the law" even though the word certainly has a common lay meaning. In just the same way, in this case "extreme disregard for human life" is a form of words that is used in ordinary speech, but which also has a specialized legal meaning. If anything, I would venture that in the everyday speech of citizens of this circuit, the term "discrimination" appears with considerably greater frequency than the phrase "extreme disregard for human life." I also note that the prosecutor phrased the question identically to all of the eyewitnesses, and used the exact phrase, "extreme disregard for human life,"

that appeared in the jury instructions. Thus, given the law and reasoning in *Torres,* I am unable to conclude that the conclusory opinions of the witnesses do anything more than "tell the jury what result to reach." [1] I thus dissent from the holding that the testimony was admissible.

The court's opinion goes on to state, in footnote 8, at page 1429, that the error was also harmless. Although this is a very close question, I am unable to agree with this as an alternative grounds for affirmance. The court is certainly correct, as it states in the footnote, that "the jury in this case had more than adequate evidence from which to conclude beyond a reasonable doubt that Sheffey was guilty" of murder. However, the harmless error standard requires something more than simply subtracting the offending testimony and gauging the likely outcome in the absence of that testimony. Instead, we must gauge whether the prospect of an acquittal or a hung jury in the absence of the wrongful testimony was sufficiently great to say that the admission of the testimony affected Sheffey's substantial rights. Under Fed. R.Crim.P. 52(a), the prosecution bears the burden of showing that Sheffey did *not* suffer prejudice as a result of the error. *United States v. Olano,* — U.S. —, —, 113 S.Ct. 1770, 1778, 123 L.Ed.2d 508 (1993); *McCandless v. United States,* 298 U.S. 342, 347–48, 56 S.Ct. 764, 766, 80 L.Ed. 1205 (1936) (stating "well-settled rule that an erroneous ruling which relates to the substantial rights of a party is ground for reversal unless it affirmatively appears from the whole record that it was not prejudicial"). Accordingly, I believe that the admission of this testimony did affect Sheffey's substantial rights.

This case inherently involves a close line-drawing exercise, and our circuit has recognized that the weight of evidence against a defendant is a crucial factor in the harmless error analysis. *United States v. Alt,* 996 F.2d 827, 829 (6th Cir.1993) (failing to find an

---

1. Footnote 6 of the court's opinion, at page 1426, states that the witnesses "had no trouble understanding" the questions put to them. The witnesses' lack of confusion is, however, irrelevant. The issue is whether the jury was impermissibly

led toward a certain conclusion. In fact, the clarity and certainty of the responses only heightens the danger that the jury was affected by the witnesses' submerged and possibly erroneous legal conclusions.

error harmless where evidence was less than overwhelming). Sheffey's driving *was* atrocious and, as he now admits, criminal. Nevertheless, an even higher level of culpability is necessary for a finding that the crime involved was murder, rather than manslaughter.[2] On that question, the introduction of testimony from the eyewitnesses was almost certainly intended, and taken, as an opinion on the legal conclusion the jury was asked to reach. This fact leads me to conclude that the error, as such I believe it to be, was not harmless under Fed.R.Crim.P. 52(a). I therefore dissent as to this portion of the court's opinion.

**2.** This distinction also leads to an enormous increase in punishment. *Compare* USSG § 2A1.2. (assigning a Base Offense level of 33 for second-degree murder, ultimately leading to a 10–year sentence) *with* USSG § 2A1.4.(a)(2) (assigning a Base Offense level of 14 for involuntary manslaughter; comparable adjustments would result in a sentence of about one year.)