**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Brian SMITH, Defendant–Appellant.**

No. 02–1017.

United States Court of Appeals,
Sixth Circuit.

July 15, 2003.

BEFORE: NELSON, BOGGS, and COLE, Circuit Judges.

## OPINION

COLE, Circuit Judge.

On August 29, 2001, Defendant–Appellant Brian Smith was convicted of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g). Smith was sentenced to a term of twenty-seven months in the custody of the Bureau of Prisons, to be followed by a two-year term of supervised release. On appeal, Smith raises two points of error concerning evidentiary matters that arose at his trial. First, Smith argues that the repeated solicitation by the prosecutor of the opinion of a government witness regarding whether Smith possessed the firearm spoke to the ultimate issue in the case and therefore invaded the province of the jury. Second, Smith asserts that it was reversible error for the prosecutor to question a government witness about the characteristics of the firearm at issue in this case, thereby causing prejudice to Smith.

For the reasons that follow, we **AFFIRM** the judgment of the district court.

## I.

On April 9.2001, at approximately 2:30 a.m., two Michigan State police troopers, David Geyer and Jay Kurowski, initiated a traffic stop of a GMC Yukon vehicle that was traveling well above the posted speed limit. Smith, the driver of the vehicle, was unable to provide his license at the request of Geyer, and Geyer then placed Smith under arrest for operating a vehicle without a license. There was an individual in the passenger's seat and two individuals in the rear seat of the car. After the three passengers were asked to exit the vehicle, Kurowski conducted a search of the Yukon and found a firearm on the driver's side between the seat and the console. The troopers ran a LIEN check on the vehicle, and learned that it was registered to Brian and Margaret Smith. On June 6, 2001, a grand jury in the Eastern District of Michigan returned a one-count indictment charging Smith with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g).

A jury trial commenced on August 28, 2001. Geyer was the Government's first witness, and he was followed by Kurowski. During the testimony of Kurowski, the following exchange took place:

Uetz (prosecutor): So, the handle and the stock of that gun were visible to you on the passenger's side of the car?

A: Yes.

Q: And you've described the size of the car?

A: Yes.

Q: And you saw the driver's side of the car?

A: Yes.

Q: If that much was visible to you from the driver's side, is it a fair assumption— I'm sorry. If that much was visible to you from the passenger's seat, is it a fair assumption that the driver would have seen it?

Finn (defense attorney): I'm making an objection again to that testimony.

The Court: I think that goes to weight, not to admissibility. And the jury will hear the answer and determine what weight, if any, should be given.

Uetz: Thank you, Your Honor.

Q: Trooper [ ], from where a driver would have been seated in the car, would they have seen the gun?

A: Yes.

Q: Why do you say that?

A: I believe that it would have been impossible for the driver of the vehicle not to see it. Since the fact that so much was protruding from in-between the console and the seat, there's no way, in my opinion, that the driver couldn't have seen it.

Q: And was it close to the back of the driver's seat like towards the back of it, or was it up—

A: Towards the front.

Q: Okay. And does that have any significance to you?

A: Yes, it did.

Q: Could you tell the jury, please?

A: It would appear that the weapon belonged to the operator of the vehicle.

Finn: Excuse me. Continued objection to the opinion.

The Court: That objection is sustained. It's a different objection. And that's the question the jury will have to decide, as to who possessed the gun.

Uetz: Yes, Your Honor.

Q: Trooper Kurowski, in your experience as a Michigan State Police trooper, and all these traffic stops that you've been involved in, have you come across cars where individuals in the cars have had weapons in the car with them?

A: Yes.

Q: All right. Are there places where a weapon can be stored in a car that makes it more accessible?

A: Yes.

Q: And you saw this gun, you've already testified, between the driver's seat and the console, closer to the driver's side of the seat?

A: Yes.

Q: Based on your experience with the Michigan State Police and based upon your knowledge with accessibility and where guns are accessible, was this gun very accessible?

A: Yes, it was.

Q: When you observed the gun there, did that have any significance to you, the location right there?

A: Yes, it did.

Q: Can you tell the jury, please, what the significance is?

A: It appeared that the location of the weapon would have been accessible for the driver to either, one, make an attempt to assault my partner, myself, could have been— it appeared that it would have belonged to the driver.

Finn: Objection again to opinion testimony.

The Court: Sustained. And please don't ask the same question a third time.

Uetz: Yes, Your Honor.

Kurowski's testimony continued from there without incident, and the Government called its final witness, Steven Toth, a Supervisor and Special Agent with the Bureau of Alcohol, Tobacco & Firearms. The Government used Toth an expert in the area of interstate nexus of firearms and types of firearms, as a witness for two reasons. First, Toth could establish that the firearm in question had the interstate nexus required for the application of § 922(g). Second, Toth could clarify some of the apparent confusion that had arisen regarding the type of firearm found in Smith's vehicle. The original indictment incorrectly described the firearm as a semiautomatic pistol. Before the start of trial, the Government moved for an amendment in the indictment to reflect that the weapon was actually a rifle. The district court allowed the amendment. On cross-examination, defense counsel questioned both Geyer and Kurowski about their identification, or misidentification, of the firearm. Because the interstate nexus of the firearm was not contested by the defense, the Government asked only a few brief questions regarding this issue "for the record." After establishing the requisite nexus,

Toth was questioned about the nature of the firearm.

Q: .... Does a typical rifle look like that?

A: No, it does not.

Q: Does that resemble a machine gun?

A: It resembles its sister gun, which is a machine pistol.

Q: Okay. This type of rifle has a sister gun?

A: Yes. This is a CM–11. The M–11 is a pistol, is classified as a pistol. And the M–12 also is a pistol. The only reason this is a carbine is because the model is CM, which the C stands for carbine....

Q: What is the difference between a pistol and a rifle?

A: With a pistol here in the state of Michigan, you have to get a pistol purchase permit. With a rifle, you do not. And a rifle has to be 26 inches or longer, where a pistol could be as small as—the barrel could be as small as two inches.

Q: What I mean, really, the picture that we are looking at, how long is the barrel on that gun?

A: This one the length protrudes about two inches. Inside here, I think it goes back about five inches. And basically the difference between a pistol and a rifle is the pistol you can conceal. A rifle, you really can't stick it in your pocket or hide it on your body.

Q: How long is the barrel on most rifles?

A: 26 inches—well, 16 inches or greater.

Q: Okay. And what is it about this gun—if you can take me through this slowly, because I don't understand gun parts as well as you do. What is it about this gun that makes it a rifle instead of, let's say, a machine gun or a machine pistol?

A: This gun was classified by ATF a carbine rifle because of its designation CM–11. That is the model. An FMJ CM–11 had a longer barrel and it has a stock. So, if you unfolded the stock all the way out and measured it from the end of the stock all the way to the end of a barrel, you fit the definition of a rifle. It was more than 16 inches, you know, going up to 26 inches. This gun is very popular because the stock comes off and the barrel is replaced with a short barrel and you have a pistol without going through the process of getting a pistol purchase permit—or, you have what looks like a pistol. This is not a pistol. This is a short barrel rifle.

Q: Okay. Let's get back to the barrel. You mentioned that that barrel at about two inches outside the gun is not the barrel that that gun would have been produced with?

A: That's correct.

Q: Could you tell the jury what that gun would have had on the front of it when it was manufactured?

A: It would have a barrel that is not threaded. This is threaded to put a flash suppressor on it, and it would also have a barrel that would stick out about another eight inches or so. This is just an aftermarket barrel that this same company makes that you can buy, but it is illegal to put onto this gun.

Q: All right. Now, you have mentioned that this gun has threaders and you could attach a flash suppressor?

A: Yes.

Q: Would you tell the jury what a flash suppressor is?

A: It just hides the muzzle flash when you pull the trigger.

Q: So when you shoot a gun at night, would a flash suppressor make it look any different?

A: Yes. Instead of seeing a big flame shooting out, it is going to diffuse it so that you are not going to see exactly where it shot from.

The Court: May I interrupt, please. This is fascinating. At least I'm fascinated. I take that reaction that the jurors may or may not be fascinated. But the relevance, please?

Uetz: Your Honor, the Defense attorney has made quite a point with both of our two troopers that they believed that this was a machine gun. I expect that—

The Court: You have covered those points. Whether or not you can put a flasher on it or not a flasher and—and I don't want to make light of it, but when you say that, I think of maybe a trench coat that goes over the barrel. I'm not interested, and I don't think it's relevant to what the charge is here.

Uetz: Yes, Your Honor. It is in order to ask—

The Court: I understand. But you've already asked those questions concerning why it's a rifle and why it is a sister gun and all of that. You are going now into accessories, that are not relevant to this case.

Uetz: Yes, Your Honor.

The Court: That is my ruling.

Uetz: Thank you, Your Honor.

Q: Agent Toth, this sort of firearm, have you come across it in your work as an ATF agent before?

A: Yes. This is a very popular gun here.

Q: When you say popular, could you tell the jury what you mean by that?

A: We recover a lot of these things in crimes, or the police and us recover a lot of these guns. This is one of the high—I guess if you were to look at all the guns that are traced in the state, this gun is traced a lot.

The Court: May we have a sidebar, please?

(Bench conference held out of the hearing of the jury, between the Court and counsel, on the record as follows:)

Finn: We had an objection before you said may we approach.

The Court: Well, I'm wondering if you had slipping [sic] something, maybe turkey with a sleeping agent in it. But this is again interesting, but it's not relevant to the charge. If it's a popular gun used in a crime, you can describe any gun in that manner. It's not relevant, and it's only prejudicial, and it's going to stop.

Uetz: Okay.

Finn: Thank you.

(End of Bench conference.)

On appeal, Smith asserts two assignments of error. First, he contends that it was prosecutorial misconduct for the Government to have questioned Kurowski regarding his opinion as to whether Smith "possessed" the gun because this was the ultimate issue for the jury to consider at trial. Second, he argues that it was prosecutorial misconduct for the Government to elicit testimony from Toth regarding the characteristics of the firearm recovered from Smith's vehicle.

## II.

### A.

■ Smith argues that the prosecutor committed misconduct by eliciting Kurowski's opinion as to whether Smith possessed the firearm that was recovered from the vehicle. This court has adopted a two-step approach for determining when prosecutorial misconduct warrants a new trial. *See United States v. Carroll*, 26 F.3d 1380, 1387–90 (6th Cir.1994). First, we must determine whether the prosecutor's conduct was improper. *Id.* at 1387. If deemed improper, it must then be deter-

mined whether the error was harmless *Id.* at 1389.

Federal Rule of Evidence 704 provides that "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." FED.R.EVID. 704(a). We have recognized that Rule 704 does not lower the bar so as to admit all opinions, but rather, its effect is to remove the proscription against opinions on "ultimate issues," thereby shifting the focus to whether the testimony is "otherwise admissible." *Torres v. County of Oakland,* 758 F.2d 147, 150 (6th Cir.1985).

However, we have also recognized a problem that arises when testimony containing a legal conclusion is allowed, as it may convey a witness's unexpressed, and perhaps erroneous, legal standards to the jury. *Id.* "The best resolution of this type of problem is to determine whether the terms used by the witness have a separate, distinct and specialized meaning in the law different from that present in the vernacular. If they do, exclusion is appropriate." *Id.* at 151; *see also United States v. Sheffey,* 57 F.3d 1419, 1426 (6th Cir.1995) (same).

The testimony of Kurowski, therefore, stating that he believed that the location of the firearm indicated that it belonged to Smith, did not violate Rule 704. Though Kurowski twice stated that he believed that the gun belonged to Smith, the term "belong" does not have a meaning identical to the legal term "possession" contained in the statute. Moreover, even if Kurowski had used the term "possession," in the present context, there is no distinction between the legal term of art and the common vernacular usage that would render the testimony inadmissible under Rule 704. Thus, because the Government was not soliciting evidence that was in violation of Rule 704, the conduct of the prosecutor in this regard cannot be said to be improper. Accordingly, the first prong of the *Carroll* test for prosecutorial misconduct is not satisfied.

### B.

Because the defense did not object to Toth's testimony at trial, we review the corresponding purported misconduct at trial for plain error. *United States v. Emuegbunam,* 268 F.3d 377, 406 (6th Cir. 2001). Smith contends on appeal that the alleged misconduct of the prosecutor in repeatedly questioning Toth about the nature of the firearm was plain error. Under the plain-error test, before an appellate court can correct an error not raised at trial, there must be: (1) error; (2) that is plain; and (3) that affects substantial rights. *United States v. Cotton,* 535 U.S. 625, 631, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002). If all of these conditions are satisfied, then the appellate court may exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Id.*

In the present case, defense counsel opened the door to testimony regarding the nature and characteristics of the firearm by asking questions to Geyer and Kurowski regarding their identification of the gun. By raising the issue of the identification of the gun, intentionally or unintentionally, to the jury, defense counsel enabled the Government to question its firearms expert regarding the reasons why the gun may have been mistakenly identified. Smith contends that he was unfairly prejudiced by Toth's statement that the particular gun was popular and recovered in a lot of crimes. However, the Government points out that this information speaks to Toth's familiarity with the particular weapon. The degree to which Toth described the firearm was appropriate con-

sidering the questions presented by the defense concerning the identification of the gun. As soon as Toth's testimony strayed towards irrelevant or prejudicial matters, such as available gun accessories and the frequency with which this type of gun was used for criminal activity, the district court, despite receiving no objections from defense counsel, immediately halted the testimony. Thus, plain error cannot be shown. Alternatively, even if there was plain error, the error clearly cannot be said to rise to the level of seriously affecting the fairness, integrity, or public reputation of the trial.

## III.

For the foregoing reasons, we **AFFIRM** the judgment of the district court.