OPINION
{¶ 1} Defendant-appellant, Clarence Wiley, appeals from a judgment of the Franklin County Court of Common Pleas convicting him of the murder of Kelly Evans. For the reasons that follow, we affirm.
 {¶ 2} On May 23, 2002, defendant was indicted by the Franklin County Grand Jury on one count of aggravated murder with a firearm specification in violation of R.C. 2903.01 and 2941.145, respectively, and one count of having a weapon while under a disability in violation of R.C. 2923.13. Defendant waived his right to a jury trial as to the count charging having a weapon while under a disability. Following the close of all the evidence, the jury was instructed on the indicted offense and the lesser included offense of murder, R.C. 2903.02. The jury returned a guilty verdict as to murder with a firearm specification. After the jury was excused, the court heard further evidence and found defendant guilty of having a weapon while under a disability.
 {¶ 3} By judgment entry filed March 11, 2003, the trial court sentenced defendant to 15 years to life on the murder charge, with an additional three years' incarceration on the firearm specification. The court imposed a one-year sentence on the having a weapon while under disability charge to be served concurrently to the murder sentence. On April 1, 2003, the trial court filed a corrected judgment entry. On April 9, 2003, defendant filed a notice of appeal.
 {¶ 4} Defendant and his girlfriend, Sadrena Godette, lived together at 47 Auburn Avenue in Columbus, Ohio, for approximately one and one-half years prior to May 8, 2002. Prior to their living together, defendant and Godette had been friends for many years, having attended high school together in Cincinnati. On May 8, 2002, while Godette and defendant were living separately in Cincinnati, they had a series of three confrontations. During the first, Godette informed defendant that she was leaving him and was going to retrieve her belongings from the apartment they shared in Columbus. Godette suggested that defendant recruit someone to help him do the same. Later that day, defendant took Godette's eyeglasses and demanded the key to the apartment in exchange for their return. Finally, Godette and her friend, Kelly Evans, were walking when defendant approached in a car. Evans asked Godette if she wanted him to get her glasses back from defendant and if she wanted him to shoot defendant for her.
 {¶ 5} Later that evening, Godette recruited her friend, Michael Barnes, to drive her to Columbus and help retrieve her belongings from the apartment. Barnes has been profoundly deaf since childhood and reads lips well, "depend[ing] on the person." (Tr. 175.) Because Barnes did not think his car could make the trip to Columbus, he paid Evans to transport them in his vehicle. During the trip, Barnes drank a 40 ounce beer; Evans and Godette drank beer and smoked crack cocaine. Godette was also high on Valium.
 {¶ 6} On May 8, 2002, Leonard Warren, a friend of defendant, Godette, and Barnes, agreed to drive defendant to Columbus and help him recover his possessions from the apartment. Defendant and Warren each drank a 24 ounce beer before they left Cincinnati and split a six-pack of 16 ounce beers on the drive. Warren testified that he did not bring a gun with him on the trip, nor did he ever observe a gun either in the car or on defendant.
 {¶ 7} Upon arriving at the apartment building, Warren parked his car in the parking lot directly behind a blue van that was parked perpendicular to and directly behind a green car and white van that were parked adjacent to one another in a row of several cars parked facing the apartment building. Defendant and Warren began loading defendant's property into Warren's car. About an hour later, Godette, Barnes, and Evans arrived. Evans parked his vehicle on the street in front of the apartment building, approximately 30 yards from the parking lot. Godette and defendant began arguing, and Godette began to pull items from the trunk of Warren's car. When she attempted to hand a VCR to Evans, defendant knocked it out of her hands. According to Warren, when defendant saw Evans, he asked Godette why she brought Evans to Columbus with her. Godette testified that defendant said "Oh, no, not you again" when he saw Evans. (Vol. II, Tr. 218.)
 {¶ 8} Warren noticed Evans, who had moved between the green car and white van, start to back up as defendant ran toward him. Warren moved closer to see what was happening, but his view was partially blocked by the white van. However, Warren could see Evans and defendant fighting between the cars. During the fight, Evans' shirt came untucked. Warren clearly saw that defendant had a gun in his right hand, with his finger on the trigger, and that Evans had a hand around each of defendant's wrists, trying to keep defendant's arms in the air. As defendant and Evans struggled, Warren heard a shot fired, and "guess[ed]" that defendant fired the shot downward. (Vol. I, Tr. 94.) Second and third shots were fired while Evans and defendant continued to struggle. According to Warren, defendant was holding the gun when all three shots were fired. The third shot struck Evans in the left side of the head, and he immediately fell to the ground. Although she could not see much of the struggle or who had the gun, Godette turned to defendant after she saw Evans fall and said "you have killed him." (Vol. II, Tr. 224.) Defendant responded, "Look what you made me do." (Vol. II, Tr. 225.)
 {¶ 9} Defendant told Evans to "get up" and began to kick him repeatedly. (Vol. I, Tr. 97.) Defendant pointed the gun at Barnes and asked him "if [he] wanted some of this." (Vol. I, Tr. 174.) Warren put the VCR in the trunk of his car and got in. Defendant got in the car and said "let's go." (Vol. I, Tr. 99.) The two then drove back to Cincinnati. Although Warren did not actually see defendant with a gun while they were in the car, he "assumed" that he had one. (Vol. I, Tr. 102.) According to Warren, defendant was crying and acting "very remorseful" about what had happened. Id. Defendant said "[o]h, God, I hope he is not dead. I hope he is all right. What have I gotten myself into." (Vol. I, Tr. 103.) Defendant asked Warren to let him out of the car away from his home, and Warren took defendant's possession to the home of one of defendant's relatives.
 {¶ 10} Godette testified that after she saw Evans fall, she started running toward Evans' vehicle. After hearing a fourth shot, she and Barnes began walking up Auburn Avenue.
 {¶ 11} Dominec Russo, who lived in a nearby apartment, testified that he heard two shots in quick succession, a short pause, then a third shot. He heard a fourth shot approximately 15 seconds after the third.
 {¶ 12} Barnes testified that he witnessed the incident from the street while standing in front of Evans' vehicle. He saw a gun flash immediately after he noticed defendant reach behind his back. Barnes further testified that he did not see Evans with a gun either on the way to Columbus or during the fight with defendant. Barnes averred that although he did not know from where defendant produced the gun, he was certain he saw him with a gun when Evans fell. Barnes further testified that a fourth shot was fired approximately five to 10 seconds after the third.
 {¶ 13} When police arrived at the scene, they discovered Evans lying between two cars, bleeding from a gunshot wound to the left side of his head. Evans was alive, but unresponsive, and was transported to a nearby hospital, where he later died.
 {¶ 14} Police interviewed several residents in the area, but none saw what had happened. Several items were recovered from the scene, including four spent bullet casings found between the green car and white van. A watch with a broken band and back was found behind the blue van. Bullet strikes were found on the hood of the green car and the driver's side of the white van. A spent bullet was found embedded under the hood of the green car.
 {¶ 15} Deputy County Coroner Patrick Fardal performed an autopsy on Evans and determined the cause of death to be a gunshot wound to the head. Fardal further determined that the bullet passed through Evans' brain from left to right in a fairly horizontal path and that the muzzle of the gun was in contact with the side of defendant's head at the time the shot was fired.
 {¶ 16} As noted previously, defendant was convicted of the lesser included offense of murder and was sentenced pursuant to statute. Defendant has timely appealed his conviction and, through counsel, asserts three assignments of error for our review:
[I.] Appellant was denied effective assistance of counsel, and due process in violation of his rights under the Fifth, Sixth andFourteenth Amendments to the United State's [sic] Constitution and under Article I, Section 10 of the Ohio Constitution.
[II.] The trial court committed reversible error when it entered judgement against Appellant, when the evidence was insufficient to sustain a conviction and was not supported by the manifest weight of the evidence.
[III.] The trial court commits reversible error when Appellant was convicted of murder under R.C. 2903.02, but states in its judgment entry that Appellant was guilty of murder under R.C.2903.01.
 {¶ 17} Defendant, with leave of court, has filed a pro se supplemental brief in which he asserts two additional assignments of error:[1]
[IV.] The trial court failed to charge Appellant with the least degree of the offense charged on the bases [sic] that Appellant's indictment failed to state the degree of the offense which Appellant was accused of or is alleged to have committed.
[V.] The trial court erred in sentencing Appellant to the mandatory sentence of Murder, because the Verdict Form failed to specify the degree of the offense of Murder of which Appellant was found guilty of.
 {¶ 18} In his first assignment of error, defendant contends that he was denied effective assistance of counsel as guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Section 10, Article I, Ohio Constitution. In particular, defendant asserts that he received ineffective assistance of counsel because: (1) counsel failed to pursue a theory of self-defense; (2) counsel failed to allow defendant to testify at trial; and (3) counsel failed to request a jury instruction on negligent homicide.
 {¶ 19} To prevail on a claim of ineffective assistance of counsel, a defendant must satisfy the two-prong test set forth inStrickland v. Washington (1984), 466 U.S. 668, 104 S.Ct. 2052:
A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction * * * has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction * * * resulted from a breakdown in the adversary process that renders the result unreliable.
Id. at 687.
 {¶ 20} "Judicial scrutiny of counsel's performance must be highly deferential." Id. at 689. In Ohio, a properly licensed attorney is presumed competent and the burden of proving ineffectiveness is on the defendant. State v. Smith (1985),17 Ohio St.3d 98, 100. Counsel's actions which "might be considered sound trial strategy," are presumed effective. Strickland at 689. "Prejudice" exists only when counsel's performance renders the result of the trial unreliable or the proceeding unfair. Id. The accused must demonstrate that there exists a reasonable probability that a different verdict would have been returned but for counsel's deficiencies. Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.
 {¶ 21} We first address defendant's claim that his counsel was ineffective in failing to pursue a theory of self-defense. Initially, we note that the Ohio Supreme Court has recognized that if counsel, for strategic reasons, decides not to pursue every possible trial strategy, defendant is not denied effective assistance of counsel. State v. Brown (1988),38 Ohio St.3d 305, 319. When there is no demonstration that counsel failed to research the facts or the law or that counsel was ignorant of a crucial defense, a reviewing court defers to counsel's judgment in the matter. State v. Clayton (1980), 62 Ohio St.2d 45, 49, citing People v. Miller (1972), 7 Cal.3d 562, 573-574.
 {¶ 22} Under Ohio law, self-defense is an affirmative defense for which an accused must prove the following by a preponderance of the evidence: (1) the accused was not at fault in creating the situation giving rise to the affray; (2) the accused had a bona fide belief that he or she was in imminent danger of death or great bodily harm and that the only means of escape from such danger was in the use of force; and (3) the accused must not have violated any duty to retreat or to avoid the danger. State v.Williford (1990), 49 Ohio St.3d 247, 249, citing State v.Robbins (1979), 58 Ohio St.2d 74, paragraph two of the syllabus. Further, the elements of self-defense are cumulative. "If the defendant fails to prove any one of these elements by a preponderance of the evidence he has failed to demonstrate that he acted in self-defense." State v. Jackson (1986),22 Ohio St.3d 281, 284. (Emphasis sic.)
 {¶ 23} The evidence at trial does not support a self-defense scenario. First, the evidence establishes that defendant was at fault in creating the situation giving rise to the affray. Warren, the only witness who related how the physical confrontation between defendant and Evans began, testified that defendant knocked the VCR out of Godette's hands when she attempted to give it to Evans. No evidence establishes that Evans reacted aggressively to defendant's actions. Second, no evidence establishes that defendant believed that he was in imminent danger of death or great bodily harm that mandated the use of deadly force. Warren testified that Evans was backing up between the cars while defendant ran toward him. Warren further testified that defendant had a gun in his hand with his finger on the trigger. Warren further testified that Evans had his hands on defendant's wrists in an attempt to keep the gun in the air. Barnes testified that immediately after he saw defendant reach behind his back, he saw a gun flash. He further testified that he saw defendant with the gun in his hand after Evans fell to the ground. No evidence establishes that Evans ever touched the gun defendant held or that Evans had a second gun. Although defense counsel attempted to raise an inference that Evans brought a weapon to the apartment through evidence that Evans's shirt became untucked as he retreated from defendant's advance and from Evans' earlier threat to shoot defendant, there was no testimony or evidence that would raise a question in a reasonable person's mind as to whether defendant had a bona fide belief that he was in imminent danger of death or great bodily harm. State v.Melchior (1978), 56 Ohio St.2d 15, paragraph one of the syllabus. Finally, there is no evidence in the record that defendant was unable to retreat or otherwise avoid the danger.
 {¶ 24} Since the evidence at trial affirmatively indicates that defendant was not entitled to a jury instruction on self-defense, it would have been futile for defense counsel to urge the jury to conclude that defendant had established the defense by a preponderance of the evidence. A claim of ineffective assistance of counsel cannot be predicated upon a matter which did not constitute error. State v. Getsy (1998),84 Ohio St.3d 180.
 {¶ 25} Moreover, to argue self-defense would have required defense counsel to acknowledge that defendant purposely, rather than accidentally, shot Evans. The defenses of accident and self-defense are mutually exclusive concepts. State v. Burns
(Aug. 3, 2000), Cuyahoga App. No. 69676. In State v. Barnd
(1993), 85 Ohio App.3d 254, 260, the court noted that the defenses of accident and self-defense are "inconsistent by definition," as accident involves "the denial of a culpable mental state and is tantamount to the defendant not committing an unlawful act," whereas a defendant claiming self-defense "concedes he had the purpose to commit the act, but asserts that he was justified in the actions." Id. at 260.
 {¶ 26} During opening statement, defense counsel suggested several alternative theories of the case — that Evans' death was accidental, that defendant killed Evans in self-defense, or that defendant committed a lesser-included crime such as murder, negligent homicide or involuntary manslaughter. In summation, defense counsel argued that Evans was accidentally shot during the scuffle with defendant. Defense counsel obviously decided, given the evidence offered at trial, that this was the most effective strategy. Under the circumstances, defense counsel's decision not to pursue or attempt a self-defense argument falls within reasonable professional judgment and trial strategy. We further note that defendant has not established that defense counsel failed to conduct a thorough investigation of the law and facts or that counsel was ignorant of a crucial defense strategy. Based on the evidence presented, we cannot conclude that counsel's performance fell below an objective standard of reasonableness.
 {¶ 27} Defendant next argues that defense counsel was ineffective in failing to allow him to testify on his own behalf. During the state's summation, defendant told the court that he had informed defense counsel that he wanted to testify on his own behalf. Defense counsel requested a bench conference after which he conferred with defendant at counsel table. Thereafter, defendant did not make further request to testify and the state continued its summation.
 {¶ 28} The decision whether to call a defendant as a witness falls within the purview of trial strategy. State v. Adkins
(2001), 144 Ohio App.3d 633, 646; State v. Coulverson, Franklin App. No. 01AP-893, 2002-Ohio-1324, at ¶ 35. As such, a failure to call a defendant as a witness will not be grounds for a claim of ineffective assistance of counsel unless prejudice is demonstrated. Id. "Courts are reluctant to find on direct appeal that an attorney has been ineffective for failing to call a witness, because it is difficult to show on direct appeal that a witness's testimony could have changed the outcome of the trial."State v. Hector (Mar. 8, 2002), Montgomery App. No. 18653.
 {¶ 29} In the present case, there may have been several strategic reasons for not calling defendant to testify, e.g., avoiding a prosecutorial probe into his past convictions or preventing the jury from observing potentially unsavory character traits he might possess. Moreover, although defendant initially told the court that he wished to testify, he did not press the issue after he conferred with counsel. The record does not reflect the substance of that conversation. On the record before us, we cannot determine that defendant did not independently decide not to testify. If defendant decided to assert his right not to testify, trial counsel cannot be held responsible for the decision.
 {¶ 30} Finally, we note that on direct appeal, defendant cannot demonstrate what his testimony would have been, let alone how such testimony would have changed the outcome of this case. Although appellate counsel makes the broad claim in his brief that defendant would have testified that he shot Evans in self-defense, he also suggests that defendant may have testified that the shooting was an accident. The record itself, however, is devoid of any hint as to what defendant would have testified. Defendant is asking this court to speculate on what he would have said and how that would have affected the jury's verdict. This type of vague speculation is insufficient to establish ineffective assistance of counsel. State v. Bradley (1989),42 Ohio St.3d 136.
 {¶ 31} In sum, defendant has failed to provide sufficient evidence that his trial counsel's decision not to call him to testify was anything more than a strategic trial decision made for defendant's benefit.
 {¶ 32} Finally, defendant argues that defense counsel was ineffective in failing to request an instruction on what he contends is the lesser-included offense of negligent homicide. Defendant was originally charged with aggravated murder, which is proscribed by R.C. 2903.01: "No person shall purposely, and with prior calculation and design, cause the death of another." R.C.2903.05 defines negligent homicide as follows: "No person shall negligently cause the death of another * * * by means of a deadly weapon or dangerous ordnance as defined in section 2923.11 of the Revised Code." "A person acts negligently when, because of a substantial lapse from due care, he fails to perceive or avoid a risk that his conduct may cause a certain result or may be of a certain nature. A person is negligent with respect to circumstances when, because of a substantial lapse from due care, he fails to perceive or avoid a risk that such circumstances may exist." R.C. 2901.22(D).
 {¶ 33} Defense counsel would have been required to request an instruction on negligent homicide only if it was a lesser included offense of aggravated murder and only if the evidence supported such a charge. State v. Jacks (1989),63 Ohio App.3d 200, 205. Negligent homicide is not a lesser included offense of aggravated murder. State v. Palmer (Dec. 27, 1988), Franklin App. No. 87AP-1124 ("Although negligent homicide, a first degree misdemeanor, is a crime of lesser degree than aggravated murder, a capital offense, one may commit aggravated murder without the use of a deadly weapon or dangerous ordnance"). As such, since defendant was charged with aggravated murder, defense counsel was not ineffective in failing to request a jury instruction on negligent homicide.
 {¶ 34} Further, defendant's defense of accident would have contradicted a charge of negligent homicide because the defense of accident is a complete defense and such a defense would contradict an instruction that the homicide occurred negligently. "[N]o instruction on negligent homicide is required when the theory of the defense is predicated on an accident." State v.Gay (Nov. 2, 1990), Portage App. No. 88-P-2043, citing State v.Hill (1987), 31 Ohio App.3d 65. Further, in State v. Samuels
(Sept. 24, 1987), Cuyahoga App. No. 52527, the court explained:
In addition, the appellant presented the defense of accident at trial which by definition negates any element of intent or criminal culpability in the offense as charged. (Citation omitted). The defense of accident is totally inconsistent with a request for a jury instruction with regard to involuntary manslaughter or negligent homicide in that each of these offenses posses the element of intent and/or criminal culpability. The appellant vis-à-vis the defense of accident argues that the death of the victim did not involve the element of intent or criminal culpability.
 {¶ 35} In this case, since defendant claimed that the shooting was accidental, a request for a jury instruction on negligent homicide would have been inconsistent with the defense's strategy of seeking an acquittal. Due to the inconsistency that would have been created by requesting a charge on negligent homicide and pursing the defense of accident, defendant was not prejudiced by defense counsel's failure to request such an instruction. The first assignment of error is not well taken.
 {¶ 36} By the second assignment of error, defendant contends that his conviction was not supported by sufficient evidence and was against the manifest weight of the evidence.
 {¶ 37} Turning first to defendant's argument regarding the sufficiency of the evidence, the Ohio Supreme Court has stated that "`sufficiency' is a term of art meaning the legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." State v. Thompkins (1997),78 Ohio App.3d 380, 386, quoting Black's Law Dictionary (6 Ed. 1990) 1433. "In essence, sufficiency is a test of adequacy." Id. InState v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus, the Ohio Supreme Court reexamined the standard of review to be applied by an appellate court when reviewing a claim of insufficient evidence:
An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. (Jackson v. Virginia [1979], 443 U.S. 307, 99 S.Ct. 2781,61 L.Ed.2d 560, followed.)
 {¶ 38} R.C. 2903.02(A) prohibits murder and provides that "[n]o person shall purposely cause the death of another * * *." R.C. 2901.22 provides that "[a] person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature."
 {¶ 39} Defendant argues that the state adduced no evidence that he acted with a specific intention to cause Evans's death. "[A]n intent to kill may be presumed where the natural and probable consequence of a wrongful act is to produce death, and such intent may be deduced from all the surrounding circumstances, including the instrument used to produce death, its tendency to destroy life if designed for that purpose, and the manner of inflicting a fatal wound." State v. Robinson
(1954), 161 Ohio St. 213, paragraph five of the syllabus. "`[A] firearm is an inherently dangerous instrumentality, the use of which is likely to produce death.'" State v. Seiber (1990),56 Ohio St.3d 4, 14, quoting State v. Widner (1982),69 Ohio St.2d 267, 270.
 {¶ 40} In this case, Warren testified that he saw defendant holding a gun in his right hand, with his finger on the trigger, while the first three shots were fired. Barnes testified that he saw defendant with a gun when Evans fell. Barnes further testified that after Evans was shot, defendant pointed a gun at Barnes and threatened him.
 {¶ 41} Further, the state presented forensic evidence that the bullet that killed Evans passed through his brain from left to right in a fairly horizontal path and that the muzzle of the gun was in contact with the side of Evans' head at the time the shot was fired. From this evidence, the jury could reasonably conclude that defendant shot Evans intentionally, not accidentally.
 {¶ 42} In defendant's supplemental brief, he cites State v.Cass (Nov. 9, 2000), Franklin App. No. 99AP-1422, in which this court reversed a murder conviction on the ground that there was insufficient evidence to establish that the defendant acted purposely, as defined in R.C. 2901.22(A). Defendant contends that the factual circumstances of the instant case are similar to those found in Cass, and, accordingly, his conviction, like Cass', should be reversed. Defendant's reliance on Cass is misplaced, however, as this court subsequently granted the state's motion for reconsideration and by memorandum decision rendered January 25, 2001, affirmed Cass' conviction.
 {¶ 43} Defendant also erroneously relies upon In re York
(2001), 142 Ohio App.3d 524. In that case, York, a 13 year old boy, discovered a .25 caliber semiautomatic pistol in his father's dresser. He removed it and began to play with it in the presence of his cousin. At some point, York pulled the trigger while aiming the gun at his cousin. The gun did not fire. After the cousin became upset that York pointed the gun at him, York reassured him that the gun could not fire because the safety mechanism was engaged. York returned the gun to the dresser.
 {¶ 44} Later in the day, York retrieved the gun to show it to a neighborhood boy and told him that he was planning to scare some neighborhood girls with it. While talking to the girls, York showed them the gun. Because some of the girls disputed the gun's authenticity, York passed it over the fence to allow the girls to examine it. Prior to doing so, York showed one of the girls, 10 year old Tiffany Dunning, the safety mechanism and removed clip. York testified that when Dunning was handed the gun, she managed to pinch her finger by the slide in the well of the receiver while attempting to pull the slide back. She then handed the gun back to York, barrel first. York grabbed the gun by the handle and trigger. As he was lowering the gun, it fired, striking Dunning in the upper back. The bullet traveled in a "minimally downward" direction as it entered Dunning's back. Although none of the girls saw York pull the trigger, each heard the gunshot and turned to see York holding the gun in his hand, still pointed at Dunning. York ran into his house, throwing the gun in some bushes along the way.
The juvenile court entered a delinquency finding of murder with a firearm specification. The court of appeals reduced that finding to a delinquency finding of involuntary manslaughter with a firearm specification, premised upon the offense of aggravated menacing. In so doing, the court found that the state had not produced sufficient evidence that York acted purposefully in discharging the gun. In reaching its conclusion, the court relied on several factors. First, the autopsy findings that the bullet followed a "minimally downward" path prior to striking Dunning's heart were consistent with York's testimony that he was lowering the gun, albeit with his finger on the trigger, when the gun discharged. Second, several witnesses testified that York appeared to be extremely surprised and disturbed by the firing of the gun. Evidence was adduced that the gun's safety mechanism was engaged earlier in the day, that there had been no known attempt by the defendant to intentionally disengage the safety mechanism, and that the clip had been removed. Third, and most important to the court, there was a total lack of evidence of animus or motive on York's part against Dunning. The court noted that the two were friends and were acting in a friendly manner toward one another up until the moment the gun discharged. The court also noted that there was no evidence that Dunning provoked York, which might have explained why York would purposefully fire a gun at her from point blank range while her back was turned.
 {¶ 45} In contrast, defendant and Evans are adults on opposite sides of a domestic dispute. They were involved in a confrontation several hours prior to the shooting and were engaged in a physical altercation when defendant discharged a weapon three times. The third shot struck Evans in the side of the head. Defendant pointed the gun at Barnes and threatened him. Defendant fired a fourth shot as Godette and Barnes fled. The autopsy findings showed that the muzzle of the gun was in contact with the side of Evans' head and that the bullet followed a horizontal path through Evans' brain. The facts in York are clearly distinguishable from those in the instant case.
 {¶ 46} When reviewing the evidence in a light most favorable to the prosecution, we find that there is sufficient evidence to allow a rational trier of fact to find beyond a reasonable doubt that defendant acted purposefully and not accidentally in shooting Evans.
 {¶ 47} In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. State v. Otten (1986), 33 Ohio App.3d 339,340. In Thompkins, the court stated, "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a `thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." Id. at 387, citing Tibbs v. Florida (1982), 457 U.S. 31, 42,102 S.Ct. 2211. Nevertheless, "the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
 {¶ 48} Defendant argues that several conflicts in the evidence rendered the jury's verdict unreliable. In particular, defendant argues that Barnes' testimony that he saw defendant with a gun after Evans fell and that he read defendant's lips to say "do you want some of this" should be disregarded because Barnes is nearsighted, was not wearing the glasses he was prescribed to wear at night, was at least 30 yards from the scene and had his view obstructed by the white van. Defendant also argues that conflicting testimony offered by Warren and Barnes as to where Barnes was standing during the incident "brings into serious doubt" the accuracy of Warren's testimony. Defendant further maintains that Warren's testimony that he saw defendant holding a gun should not be believed because Warren testified that he recognized that it was defendant's arm because defendant was wearing a watch during the struggle with Evans. Defendant argues that because the watch was found near Warren's car, it must have come off when Evans slapped the VCR out of defendant's hand; thus, defendant could not have been wearing the watch during the fight with Evans. However, as we have noted, both the weight and credibility given to witness testimony is within the province of the jury. The jury was free to believe all, part, or none of the testimony of each of the witnesses who appeared before them. State v. Burke, Franklin App. No. 02AP-1238, 2003-Ohio-2889 at ¶ 15. The choice between credible witnesses and their conflicting testimony rests solely with the trier of fact and a reviewing court may not substitute its own judgment for that of the trier of fact. Id.
 {¶ 49} After reviewing the record and the entire transcript of the proceedings, we conclude that the jury reasonably resolved any conflicts in the evidence and any biases on the part of the witnesses in favor of the state. Accordingly, we cannot find that the jury lost its way and created such a manifest miscarriage of justice that defendant's conviction must be reversed and a new trial ordered. The second assignment of error is not well-taken and is overruled.
 {¶ 50} By the third assignment of error, defendant contends that the trial court committed reversible error when it incorrectly cited the Ohio Revised Code section for aggravated murder, rather than murder, in its judgment entry. Defendant requests that this court remand the matter to the trial court for correction of its judgment entry.
 {¶ 51} Defendant was convicted of murder, a violation of R.C.2903.02. However, in its original judgment entry, the trial court stated that defendant was convicted of murder under R.C. 2903.01, which is the Ohio Revised Code section for aggravated murder. The trial court filed a corrected judgment entry which indicated the correct Ohio Revised Code section for murder. The court's citation to R.C. 2903.01 in its original judgment entry was clearly a typographical error. Crim.R. 36 provides: "Clerical mistakes in judgments * * * may be corrected by the court at any time." The remedy sought by defendant has already been performed. Accordingly, the third assignment of error is not well-taken and is overruled.
 {¶ 52} As defendant's fourth and fifth assignments of error are interrelated, they will be combined for purposes of discussion. Under the fourth assignment of error, defendant contends that the indictment was defective under R.C.2945.75(A)(1) because it did not state the degree of offense defendant was alleged to have committed. Similarly, defendant contends under the fifth assignment of error that the verdict form was defective under R.C. 2945.75(A)(2) because it did not state the degree of offense for which he was found guilty.
 {¶ 53} R.C. 2945.75 provides in relevant part:
(A) When the presence of one or more additional elements makes an offense one of more serious degree:
(1) The * * * indictment * * * shall state the degree of the offense which the accused is alleged to have committed, or shall allege such additional element or elements. Otherwise such * * * indictment * * * is effective to charge only the least degree of the offense.
(2) A guilty verdict shall state either the degree of the offense of which the offender is found guilty, or that such additional element or elements are present. Otherwise, a guilty verdict constitutes a finding of guilty of the least degree of the offense charged.
 {¶ 54} Aggravated murder and murder are considered "unclassified" felonies, because they are not classified by degree of felony. State v. Hollingsworth (2001),143 Ohio App.3d 562, 567. In State v. Biros (Dec. 29, 1995), Trumbull App. No. 91-T-4632, the court determined that the terms "aggravated murder" and "murder" constitute a statement of the degree of the offense for purposes of R.C. 2945.75(A). In this case, Count 1 of the indictment charged defendant with "aggravated murder." In addition, the verdict form clearly states that the jury found defendant guilty of "murder." As a result, defendant's contention that the indictment and verdict form were insufficient is without merit. Accordingly, defendant's fourth and fifth assignments of error are not well taken and are overruled.
 {¶ 55} For the foregoing reasons, the assignments of error asserted both by defendant's appellate counsel and by defendant acting pro se are overruled and the judgment of the Franklin County Court of Common Pleas is hereby affirmed.
Judgment affirmed.
Bowman and Watson, JJ., concur.
[1] Defendant asserts a total of five assignments of error. Because the first, second and third are identical to those raised by appellate counsel, we need not reiterate them.