OPINION
{¶ 1} Defendant-Appellant Tangela Taylor appeals from her conviction and sentence in the Richland County Court of Common Pleas on one count of murder in violation of R.C. 2903.02(B). Plaintiff-Appellee is the State of Ohio.
 {¶ 2} On the night of November 5, 2004, twenty-one year old Bradley Taylor spent the evening out with his friends, Jeremiah Conrad, Randy Stollings, and Jason Baer. After leaving a local bar, the men returned to the Harwood Drive apartment that Brad shared with his sister, appellant Tangela Taylor. At the apartment, the men, along with the appellant and Devida Lewis, continued to drink, listen to music, and talk.
 {¶ 3} At some point after midnight in the early morning hours of November 6, 2004, a verbal argument began between Brad and the appellant. The argument started because Brad made the appellant's two-year old son, Mason, cry. The appellant demanded that Brad apologize to her son, and Brad refused.
 {¶ 4} Jason Baer testified that he was in the kitchen drinking beer and listening to music when he heard a commotion in the living room. (2T. at 271). He described the commotion as a heated argument between Brad and the appellant. (Id. at 273). Jason indicated that he thought the argument had something to do with Brad upsetting the appellant's son, Mason. (Id.). He testified that the argument went on for a few minutes, but it did not sound like a physical argument. (Id. at 274).
 {¶ 5} Jason stated that the argument moved into the doorway of the kitchen. (Id.). The appellant entered the kitchen first, followed by Brad, Jeremiah Conrad, Randy Stollings, and Devida Lewis. (Id.). Jason indicated that the argument between Brad and the appellant continued for approximately three to four minutes after they entered the kitchen. (Id. at 275). At that point, the appellant took a couple of steps away from Brad, toward the area of the kitchen sink, and grabbed a steak knife. (Id. at 275-276).
 {¶ 6} Jason testified that after the appellant grabbed the knife, she took two or three steps back toward Brad. (Id. at 276). At that time, Brad was standing still, continuing to argue with the appellant. (Id. at 277). Jason indicated that he saw appellant swing the knife at Brad, stabbing him in the chest. (Id.). He testified that from what he saw, there was no reason or justification for the stabbing. (Id. at 278). Jason indicated that the appellant had room to back away from Brad, and there were enough people in the room to take control of the situation. (Id. at 280). He also indicated that Brad was not attacking the appellant at the time of the stabbing. (Id.).
 {¶ 7} Jeremiah Conrad was also present in the appellant's apartment on the night Bradley Taylor was killed. It should be noted that, unlike the other witnesses who were present, he had not been drinking. (2T. at 298; 303). Jeremiah testified that everyone was sitting around drinking, and at some point Brad and the appellant got into an argument. (Id. at 303). The argument began because Brad made the appellant's son cry, and the appellant wanted him to apologize. (Id. at 303-04). Jeremiah indicated that, at some point during the argument, the appellant told Brad to get out of the house. (Id. at 304). Brad refused, and the appellant picked up the phone and acted like she was calling the police. (Id. at 305-306).
 {¶ 8} Jeremiah indicated that eventually Brad agreed to leave, but he was going to grab a couple of beers before he left. (Id. at 306). He testified that the appellant told Brad to just get out, and she didn't want him to take the last two beers. (Id.). Brad was trying to go into the kitchen to the refrigerator when the appellant began pushing him. (Id. at 306-07). Jeremiah stated that Brad pushed the appellant one time and told her to get off of him before going into the kitchen. (Id. at 308). At that point, the argument had gone on for more than five or ten minutes. (Id. at 309).
 {¶ 9} Jeremiah testified that by the time Brad got the beers out of the refrigerator, the appellant had followed him into the kitchen, and they continued to argue. (Id. at 309-310). During the argument, the appellant turned around and grabbed a steak knife from somewhere in the kitchen. He indicated that he saw the appellant swing the knife at Brad two (2) times. (Id. at 311). The first time that she swung the knife, he did not see any blood; however, the second time she swung the knife, Brad grabbed his chest walked a short distance away and fell on the floor. (Id. at 311-312). He indicated that, from what he saw, Brad did not walk into the knife, because he was standing still at the time of the stabbing. (Id. at 318).
 {¶ 10} Jeremiah stated that Brad had the two beers in his hands at the time he was stabbed. He indicated that after Brad was stabbed, the beers fell on the floor. This is consistent with the testimony of crime lab director, Anthony Tambasco, who stated that he found two unopened beer cans on the living room floor near the area where Brad fell. (3T. at 432-33). Mr. Tambasco testified that at the time he arrived, the cans were still cool to the touch. (Id. at. 433).
 {¶ 11} Devida Lewis, step cousin to the appellant and Bradley Taylor, was also present in the appellant's apartment that night. She testified that after the group returned from Good Fellows' bar, everyone but Jeremiah Conrad was drinking. (2T. at 336). Devida indicated that at some point, Brad and the appellant got into an argument because Brad was playing with her son, Mason, who was fussy. (Id. at 337). According to Devida, the argument went on for a "little while" during which they were yelling and screaming at each other. (Id. at 339). At one point, appellant said she was going to call the cops, and picked up the phone. She did not actually call the police, and the argument continued.
 {¶ 12} Devida testified that during the argument, the appellant hit Brad; however, he did not hit her back. (Id. at 339-40). She indicated that the argument was taking place in the doorway between the kitchen and the living room. After Brad refused to leave, the appellant walked into the kitchen and got a steak knife from the area by the sink. (Id. at 340-341). After she got the knife, the appellant walked back to the area where Brad was standing at the entrance to the kitchen. Devida stated that Brad was challenging the appellant to stab him when she swung the knife at him. (Id. at 341). She testified that the appellant missed him the first time she swung the knife, but she stabbed him in the chest the second time. (Id.).
 {¶ 13} Devida indicated that during the incident she was standing behind Brad and the appellant. She testified that from her point of view, Brad could not have walked into the knife because he was standing still, and the appellant moved toward him. (Id. at 342-43). Devida also stated that the appellant extended her arm to stab Brad. (Id. at 343). Finally, she testified that when Brad was lying on the ground after he was stabbed, the appellant told him she was sorry and not to say anything.
 {¶ 14} Mark Abrams, a dispatcher for Mansfield 911, testified that he received a call on November 6, 2004 to report a stabbing. (1T. at 121). He indicated that when the call came in, there was a female voice on the line saying that her brother had been stabbed. When he asked the caller who stabbed her brother, she stated "I don't know." (Id. at 124). Mr. Abrams testified that when he repeated question, the woman again said "I don't know," and hung up the phone. He immediately called back, and a man answered the phone. The individual who answered the phone indicated that his name was Randy Stollings.
 {¶ 15} Patrolman Joseph Petrycki, the second officer on the scene, testified that when he first encountered the Appellant, she was "out of control yelling and screaming something about send the squad." (1T. at 139). When he asked her what happened, "her first response was that she didn't know who did it, but whoever did it had ran out the back door." (Id.). Patrolman Petrycki testified that when he tried to get her to give him a name or description of the suspect, she was just yelling and screaming hysterically.
 {¶ 16} While the officers were attempting to calm the appellant down outside the apartment, Patrolman Petrycki asked her several more times to help identify the person who stabbed her brother. (1T. at 142). He testified that the appellant never became cooperative with him or answered his questions; "she just never said another word." (Id.). Patrolman Petrycki stated that during his questioning, the appellant never said that the victim had provoked her into stabbing him, or that she accidentally stabbed him. (Id. at 142-43).
 {¶ 17} Patrolman David Minard also testified that the appellant was uncooperative with the investigation when they attempted to question her at the scene. He indicated that he, Patrolman Petrycki, and Patrolman Loughman had to physically escort the Appellant outside when the paramedics arrived. (1T. at 170). Once they got her outside, Patrolman Minard asked her what happened, to which she replied that she didn't know. When he asked her where the knife was, she stated that it was in the kitchen sink. Patrolman Minard testified that he thought it was unusual that appellant knew where the knife was but did not know what had happened. The knife was ultimately recovered from the kitchen sink.
 {¶ 18} Patrolman Carolyn Young testified that while she was booking the appellant into the Mansfield City Jail, the appellant stated "I didn't mean to kill him. I stabbed him to teach him a lesson." (3T. at 505). Patrolman Young testified that appellant volunteered this information while she was attempting to ask the typical book in questions. She indicated that she did not question the appellant further about the statement because she was primarily concerned with booking her in and determining whether she was a risk of harm to herself.
 {¶ 19} The appellant also made statements in several phone calls recorded while she was in jail. Detective Eric Bosko testified that as a part of his investigation, he listened to the appellant's phone calls from the jail. (2T. 368). He testified that in the first call, the appellant stated "does everybody know what I did?" (Id. at 369). In the third call, Detective Bosko testified that the appellant asked her mother what Devida said, and stated that she told Devida not to say anything. (Id.). The appellant also comments that she doesn't want to talk on the phone because she might incriminate herself. In the fifth phone call, he testified that the appellant once again told her father to tell Devida not to say anything.
 {¶ 20} Dr. Patrick Fardal, who performed the autopsy on Bradley Taylor, testified that the victim suffered a stab wound to the chest, entering just below his left nipple. (3T. at 389). The wound was vertically oriented with a secondary tag at the bottom, indicating that the sharp part of the knife was pointing downward. (Id. at 400). Dr. Fardal indicated that the wound was approximately one half inch long and four inches deep. (Id. at 402). He also indicated that the path of the wound through the body was horizontal to the ground and going from the victim's left side towards his right side. (Id. at 405-406).
 {¶ 21} Dr. Fardal testified that, in order to go that deep, the knife would have gone through skin, muscle, and bone between the ribs before passing completely through the heart. He indicated that the victim had a nick in the bone of his rib cage, which could have been caused by the knife used in the murder. Dr. Fardal stated that the bend in the tip of the knife is consistent with hitting bone as it went into the body.
 {¶ 22} Appellant testified that she and her brother were arguing because Brad was playing with her son, Mason too rough. (3T. at 475). Appellant asked Brad to leave and he refused. (Id.). Appellant pushed Brad toward the door and Brad pushed her back so hard that she "flew back and hit the back of my head on the couch." (Id. at 475-76). Appellant continued to ask Brad to leave, and he continued to refuse. Brad began yelling and using profanity toward appellant. (Id. at 476; 478). Brad came toward appellant "real fast" and she ran into the kitchen. (Id. at 478). She grabbed a knife from the kitchen counter and walked over to where Brad was standing. (Id.). Appellant testified that Brad was taunting her to stab him and calling her names. (Id at 478-79). Appellant swung the knife at Brad because she "was scared and I thought maybe he would just leave." (Id. at 479). Appellant testified that she missed Brad on purpose. (Id.). She then swung the knife a second time. (Id. at 480-81). Appellant testified: "[w]hen I swung the knife, I swung it like this, and then I swung it back down like this and I stopped. And Brad had went back like this, and Randy then had, like — had let go and Brad came forward, and I just remember I was holding the knife and I looked up at Brad and he was right there." (Id. at 481). Appellant testified that the stabbing was an accident. (Id. at 484-85; 488).
 {¶ 23} Appellant was indicted on two counts of Murder. Count I alleged that appellant purposely caused the death of her brother in violation of R.C. 2903.02(A). Count II alleged that appellant had caused the death as a proximate result of the commission of felonious assault in violation of R.C. 2903.02(B).
 {¶ 24} A jury trial was commenced on October 3, 2005. At the conclusion of the trial the trial court instructed the jury on, in addition to the two counts of murder as alleged in the indictment, manslaughter in violation of R.C. 2903.03 and reckless homicide in violation of R.C. 2903.04. The trial court denied appellant's request for a jury instruction on negligent homicide.
 {¶ 25} On October 6, 2005 the jury returned a verdict of not guilty with respect to Count I and guilty with respect to Count II. On October 12, 2005 the trial court sentenced appellant to a term of fifteen (15) years to life imprisonment.
 {¶ 26} Appellant timely appealed and submits the following assignment of error for our consideration:
 {¶ 27} "APPELLANT WAS DEPRIVED OF EFFECTIVE ASSISTANCE OF COUNSEL PROVIDED BY THE SIXTH AMENDMENT OF THE UNITED STATES CONSTITUTION, ARTICLE 1, SECTION 10, OF THE OHIO CONSTITUTION, AS WELL AS THE DUE PROCESS PROTECTION OF THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION, AND ARTICLE 1, SECTION 16 OF THE OHIO CONSTITUTION."
 I. {¶ 28} In her sole Assignment of Error, appellant maintains she received ineffective assistance of counsel. We disagree.
 {¶ 29} A claim for ineffective assistance of counsel requires a two-prong analysis. The first inquiry is whether counsel's performance fell below an objective standard of reasonable representation involving a substantial violation of any of defense counsel's essential duties to appellant. The second prong is whether the appellant was prejudiced by counsel's ineffectiveness. Strickland v. Washington (1984), 466 U.S. 668,104 S.Ct. 2052, 80 L.Ed.2d 674; State v. Bradley (1989),42 Ohio St.3d 136, 538 N.E.2d 373.
 {¶ 30} In determining whether counsel's representation fell below an objective standard of reasonableness, judicial scrutiny of counsel's performance must be highly deferential. Bradley at 142, 538 N.E.2d 373. Because of the difficulties inherent in determining whether effective assistance of counsel was rendered in any given case, a strong presumption exists counsel's conduct fell within the wide range of reasonable, professional assistance. Id.
 {¶ 31} In order to warrant a reversal, the appellant must additionally show he was prejudiced by counsel's ineffectiveness. "Prejudice from defective representation sufficient to justify reversal of a conviction exists only where the result of the trial was unreliable or the proceeding fundamentally unfair because of the performance of trial counsel. Lockhart v.Fretwell (1993), 506 U.S. 364, 370, 113 S.Ct. 838,122 L.Ed.2d 180.
 {¶ 32} The United States Supreme Court and the Ohio Supreme Court have held a reviewing court "* * * need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." Bradley at 143, 538 N.E.2d 373, quotingStrickland at 697. As such, we will direct our attention to the second prong of the Strickland test.
Inconsistent defenses; Failure to request jury instructions.
 {¶ 33} Appellant first maintains that she received ineffective assistance of counsel when counsel argued inconsistent defenses, and because defense counsel should have requested an instruction on the defense of accident or objected to the trial court's failure to give an instruction on accident where appellant presented evidence of accident at the trial. We disagree.
 {¶ 34} A decision regarding which defense to pursue at trial is a matter of trial strategy "within the exclusive province of defense counsel to make after consultation with his client."State v. Murphy, 91 Ohio St.3d 516, 524, 2001-Ohio-0112. This court can only find that counsel's performance regarding matters of trial strategy is deficient if counsel's strategy was so "outside the realm of legitimate trial strategy so as `to make ordinary counsel scoff."' State v. Woullard,158 Ohio App.3d 31, 813 N.E.2d 964, 2004-Ohio-3395, ¶ 39, quoting State v.Yarber (1995), 102 Ohio App.3d 185, 188, 656 N.E.2d 1322. Further, the Ohio Supreme Court has recognized that if counsel, for strategic reasons, decides not to pursue every possible trial strategy, defendant is not denied effective assistance of counsel. State v. Brown (1988), 38 Ohio St.3d 305, 319,528 N.E.2d 523. When there is no demonstration that counsel failed to research the facts or the law or that counsel was ignorant of a crucial defense, a reviewing court defers to counsel's judgment in the matter. State v. Clayton (1980), 62 Ohio St.2d 45, 49,402 N.E.2d 1189, citing People v. Miller (1972), 7 Cal.3d 562,573-574, 102 Cal.Rptr. 841, 498 P.2d 1089; State v. Wiley,
10th Dist. No. 03AP-340, 2004-Ohio-1008 at ¶ 21.
 {¶ 35} Criminal liability is predicated upon two components: the voluntary commission of a prohibited act and the requisite mental culpability or mens rea required for the offense. R.C.2901.21. Accident is not an affirmative defense. State v. Poole
(1973), 33 Ohio St.2d 18, 294 N.E.2d 888. Rather, it is a factual defense that denies that the accused acted with the degree of culpability or mens rea required for the offense, when that involves purposeful conduct. State v. Bayes (Dec. 29, 2000), Clark App. No. 00CA0032. By raising the defense of accident defendant denies that the act was intentional or purposeful.State v. Fears, 86 Ohio St.3d 329, 715 N.E.2d 136,1999-Ohio-111.
 {¶ 36} During opening statement, defense counsel suggested several alternative theories of the case — and indicated to the jury that appellant would testify. (1T. at 110-117). Counsel informed the jury "[i]f you don't find she did it knowingly — because she's not going to tell you she did it knowingly. If you believe her when she gets on the stand totally, everything, it's not knowingly." (Id. at 116). Counsel then explained that if the jury does find that appellant acted knowingly, the jury could then consider the affirmative defense of provocation. (Id. at 116-117). In closing argument counsel did argue the stabbing was accidental. (3T. at 549-550). Counsel then reminded the jury that if they did not believe that the stabbing was accidental, they should still consider the affirmative defense of provocation and find appellant guilty of the lesser offense of manslaughter. (Id. at 551-53).
 {¶ 37} Accident is defined as a "mere physical happening or event, out of the usual order of things and not reasonably (anticipated) (foreseen) as a natural or probable result of a lawful act." 4 Ohio Jury Instructions 75, Section 411.01(2). Moreover, "[a]n accidental result is one that occurs unintentionally and without any design or purpose to bring it about." Id.
 {¶ 38} A homicide is not excusable on the basis of accident unless it appears from the evidence that at the time of the killing the offender was acting in a lawful manner and without negligence. In re Jackson (1975) 45 Ohio App.2d 243,344 N.E.2d 162; State v. Palmer (Dec. 27, 1988], Franklin App. No. 87AP-1124. A person causing the death of another while engaged in unlawful activity is criminally responsible even if the firearm discharges accidentally, State v. Thrash (1952),93 Ohio App. 458, 113 N.E.2d 675; State v. Jones, 5th Dist. No. 2005-CA-00076, 2006-Ohio-271 at ¶ 45.
 {¶ 39} By appellant's own admission she went into the kitchen and retrieved a knife. (3T. at 478). She swung the knife at the victim while he was being held back by one of his friends. (Id. at 479-80). Appellant then swung the knife a second time which resulted in the knife penetrating four inches into the rib cage, collapsing a lung and completely penetrating the victim's heart. (Id. at 404-6; 412).
 {¶ 40} The jury found appellant not guilty of "purposefully" causing the death; rather appellant was found guilty of "knowingly" causing the death as a proximate result of the commission of a felonious assault. It was reasonably foreseeable that swinging the knife in the direction of the victim would cause the victim to be severely injured.
 {¶ 41} Defense counsel obviously decided, given the evidence offered at trial, that arguing alternative theories to lessen appellant's culpability was the most effective strategy. Since defense counsel did argue accident at trial, the jury verdict represents a rejection of appellants' accident arguments.
 {¶ 42} This court addressed a similar argument in State v.Rohaley (Dec. 28, 1998), Stark App. No. 1998CA00092. InRohaley, the defendant sought an instruction on the defense of accident in a case involving aggravated vehicular homicide with a driving under the influence specification. Id. at 3. The trial court denied defendant's requested instruction. Id. at 7. In upholding the trial court's refusal to instruct on the defense of accident, we stated:
 {¶ 43} "In the instant case, the court had already instructed the jury on causation. The instruction on causation indicated that in order to convict, the jury had to find that appellant's act or admissions, in their natural and continuous sequence, directly produced Letitia Ciban's death. The accident instruction would have simply indicated that the jury could acquit if appellant's acts or admissions were not the natural and reasonably foreseen result of Letitia Ciban's death. Accordingly, the instruction on `accident' did not add anything new to the general charge. Appellant, therefore, has not demonstrated that the result of the proceeding would have been different had the instruction on the defense of accident been given to the jury."Id.
 {¶ 44} The record in the case sub judice indicates the trial court instructed the jury with the standard definition of causation as to murder and reckless homicide. (3T. at 566; 571-572; 592-94; 598). According to our decision, in Rohaley, a specific instruction on the defense of accident would not have added anything to the general instruction.
 {¶ 45} Under the circumstances, defense counsel's decision to argue alternative theories falls within reasonable professional judgment and trial strategy. We further note that based on the evidence presented, we cannot conclude that counsel's performance fell below an objective standard of reasonableness. Further it is apparent that inclusion of an accident instruction would not have changed the outcome of trial.
 {¶ 46} Accordingly, we conclude appellant cannot establish that she was prejudiced by defense counsel's performance. There is no evidence that indicates the result of the trial was unreliable or the proceeding was fundamentally unfair as a result of defense counsel's failure to request a jury instruction on the defense of accident.
Incorrect jury instructions.
 {¶ 47} Appellant next argues that she was denied effective assistance of counsel by counsel's failing to object to the jury charge that was first given by the court, and objecting to the recharge of the jury after they had started their deliberations. We disagree.
 {¶ 48} The record indicates that both parties brought the erroneous instructions to the attention of the trial judge. (3T. at 578). The trial judge then informed the jury that he would be making changes to the jury instruction. (Id.). The jury retired to the jury room at 4:45 p.m. (Id. at 581). Shortly thereafter, the jurors elected to adjourn for the evening. (Id. at 583). The following day, both parties waived any defects in sending the jurors to deliberate prior to the court giving them the corrected jury charge. (Id. at 588). The court informed the jurors that changes had been made to the jury instructions. (Id. at 590-91). The court then read the pertinent provisions of the amended charge to the jury. (Id. at 591-599). A written copy of the corrected jury instructions was provided to the jury. (Id. at 599).
 {¶ 49} The record demonstrates that the errors in the jury instructions were brought to the attention of the trial court. Accordingly, any failure to object to the incorrect charge cannot be found to be prejudicial to the appellant. Further there is nothing in the record to suggest that the jurors deliberated prior to receiving the corrected charge.
 {¶ 50} Appellant has failed to demonstrate deficient performance or prejudice-in other words, "a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." States v. Bradley, supra, paragraph three of the syllabus.
Hearsay and opinion testimony.
 {¶ 51} In her final instance of ineffective assistance of counsel, appellant argues that trial counsel was ineffective in failing to object to: 1). The prosecutor's questioning appellant about her boyfriend's criminal record, 2). Testimony of Melissa Kirkpatrick regarding appellant's drinking habits and behaviors when drinking; 3). Testimony of Melissa Kirkpatrick as to Devida Lewis' statements concerning whether the victim struck appellant; 4). testimony of Dr. Daniel Dietrich regarding Dr. Sutcliffe's report that the victim suffered brain death; and 5). testimony from Jason Baer and Devida Lewis as to whether they thought the appellant intentionally stabbed the victim.
 {¶ 52} "`The failure to object to error, alone, is not enough to sustain a claim of ineffective assistance of counsel.'" Statev. Fears (1999), 86 Ohio St.3d 329, 347, 715 N.E.2d 136, quotingState v. Holloway (1988), 38 Ohio St.3d 239, 244,527 N.E.2d 831.
 {¶ 53} The evidence concerning appellant's boyfriend consisted of the prosecutor eliciting testimony that he had been in prison for aggravated robbery and upon his release the couple had reunited. (3T. at 485). Appellant has failed to demonstrate any prejudice-in other words, "a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." Bradley, supra at paragraph three of the syllabus.
 {¶ 54} The evidence concerning the appellant's drinking habits was limited. Ms. Kirkpatrick testified that on one or two occasions appellant became angry and argumentative after she had been drinking. (1T. at 200). Ms. Kirkpatrick testified that on those occasions appellant was not combative; rather simply argumentative. (Id.). Again, Appellant has failed to demonstrate any prejudice-in other words, "a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." Id., paragraph three of the syllabus.
 {¶ 55} Testimony of Melissa Kirkpatrick as to Devida Lewis' statements concerning whether the victim struck appellant were first brought out by appellant. (1T. at 209). Counsel inquired in this area in an attempt to show that there was a physical altercation between appellant and the victim prior to the stabbing. (Id.). Accordingly, appellant was not in a position to object to the follow-up questions asked by the prosecutor, as appellant had opened the door to this line of questioning.
 {¶ 56} "When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect. SeeStrickland, 466 U.S., at 690, 104 S.Ct. 2052 (counsel is `strongly presumed' to make decisions in the exercise of professional judgment). Moreover, even if an omission is inadvertent, relief is not automatic. The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight. See Bell, supra, at 702,122 S.Ct. 1843; Kimmelman v. Morrison, 477 U.S. 365, 382,106 S.Ct. 2574, 91 L.Ed.2d 305 (1986); Strickland, supra, at 689,104 S.Ct. 2052; United States v. Cronic, 466 U.S. 648, 656,104 S.Ct. 2039, 80 L.Ed.2d 657 (1984)". Yarborough v. Gentry
(2003), 540 U.S. 1, 8, 124 S.Ct. 1, 6.
 {¶ 57} The Ohio Supreme Court has stated "[w]e will ordinarily refrain from second-guessing strategic decisions counsel make at trial, even where counsel's trial strategy was questionable. State v. Clayton (1980), 62 Ohio St.2d 45, 49, 16 O.O.3d 35, 402 N.E.2d 1189." State v. Myers (2002),97 Ohio St.3d 335, 362, 780 N.E.2d 186, 217.
 {¶ 58} In any event, appellant has failed to demonstrate prejudice as a result of trial counsel's failure to object. Devida Lewis testified at appellant's trial that the victim did not strike the appellant. (2T. at 339-40). Accordingly, any error in the admission of Ms. Kirkpatrick's testimony that Devida Lewis had told her that the victim did not strike appellant was harmless beyond a reasonable doubt.
 {¶ 59} Appellant next argues that counsel failed to object to hearsay testimony provided by Dr. Daniel Detrich regarding a report generated by Dr. Stolfi.
 {¶ 60} Dr. Detrich personally examined the victim in the hospital. (3T. at 411-12). Dr. Detrich testified that he consulted Dr. Stolifi, a neurologist, who interpreted two EEG's performed on the victim. (Id. at 419-20). Dr. Deitrich testified from reports generated by Dr. Stolfi that Dr. Detrich used to confirm his diagnosis that the victim was brain dead. (Id).
 {¶ 61} Evid.R. 703 requires that an expert base an opinion or inference on facts or data either perceived by him or admitted into evidence. In State v. Mack (1995), 73 Ohio St.3d 502,653 N.E.2d 329, the Ohio Supreme Court noted "this court found admissible the opinions of doctors to be `based on facts or data perceived by [them]' within the meaning of Evid.R. 703, despite their being partially based on medical reports not in evidence, where the doctors had personally examined the defendant". (CitingState v. Solomon (1991), 59 Ohio St.3d 124, 570 N.E.2d 1118). (Id. at 502, 653 N.E.2d at 337).
 {¶ 62} Accordingly, the testimony was properly admissible under the facts of this case.
 {¶ 63} Appellant fails to state with any precision how the fact that the victim was found to be brain dead impacted upon the jury's decision that appellant was guilty of murder. There was no dispute that appellant had stabbed the victim and that the victim died as a result of that wound. Accordingly, Dr. Deitrich's testimony from reports generated by Dr. Stolfi was not germane to the issue of whether the stabbing was accidental or done with some other culpable mental state. Accordingly, even if the testimony had been improperly admitted, we conclude appellant cannot establish that she was prejudiced by defense counsel's performance. There is no evidence that indicates the result of the trial was unreliable or the proceeding was fundamentally unfair as a result of defense counsel's failure to object to this testimony.
 {¶ 64} Appellant next contends trial counsel was ineffective by failing to object or moving to strike lay opinion testimony that the appellant did not accidentally stab the victim.
 {¶ 65} We note that appellant does not separately assign as error the trial court's admission of the lay opinion testimony.
 {¶ 66} Trial counsel did object to the prosecutor's questions concerning whether the stabbing was intentional. (2T. at 280; 342). The trial court sustained the objections and asked the prosecutor to rephrase the questions. (Id.). Accordingly counsel can not be found ineffective for failing to object.
 {¶ 67} Further, both witnesses were eyewitnesses to the attack. Evid. R. 701 states: "If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of his testimony or the determination of a fact in issue". The eyewitnesses obviously had first-hand knowledge of the facts from which their opinion was formed. Having met the firsthand knowledge requirement of Rule 701(1), the eyewitness' opinion was admissible if it would help the jury to resolve a disputed fact.
 {¶ 68} The eyewitnesses described the circumstances that led to their opinions. (2T. at 278; 280; 342-43). Cross-examination is an effective means to reveal any weaknesses in the witness' conclusions. Government of Virgin Islands v. Knight (3rd
Cir., 1993), 989 F.2d 619, 630 (3d Cir.) (holding that eyewitness should have been allowed to testify that, in his opinion, defendant's firing of a gun was accidental; this was because "the witness' opinion that the gunshot was accidental would have permitted him to relate the facts with greater clarity, and hence would have aided the jury"); cert. denied, 510 U.S. 994,114 S.Ct. 556, 126 L.Ed.2d 457 (1993).
 {¶ 69} If an opinion question posed to a lay witness does not involve terms with a separate, distinct and specialized meaning in the law different from that present in the vernacular, then the witness may answer it over the objection that it calls for a legal conclusion. United States v. Sheffy (6th Cir, 1995),57 F.3d 1419, 1426. ("We see nothing in the terms `recklessly' and `extreme disregard of human life' that would require the jury to attempt to define for itself legal terms of art or to rely upon anything but their own life experience in determining Sheffey's guilt. Therefore, we hold that the district court did not err by admitting the answers despite Sheffey's protests that they called for a legal conclusion". Id. Footnotes omitted).
 {¶ 70} In the case at bar, the jury found appellant not guilty of "purposely" causing the death of her brother. Accordingly, the jury did not believe that appellant had the specific intent to cause the death of the victim. The testimony of the eyewitnesses was relevant to rebut appellant's accident defense.
 {¶ 71} There is no evidence that indicates the result of the trial was unreliable or the proceeding was fundamentally unfair as a result of defense counsel's failure to object or failure to move to strike the testimony of the eyewitnesses.
 {¶ 72} Accordingly, appellant's sole assignment of error is overruled in its entirety.
 {¶ 73} For the foregoing reasons, the judgment of the Richland County Court of Common Pleas is affirmed.
Gwin, J., Wise, P.J., and Edwards, J., concur.
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Richland County Court of Common Pleas is affirmed. Costs to appellant.